474 So.2d 783 (1985)
FLORIDA PATIENT's COMPENSATION FUND, et al., Appellants
v.
Susan Ann VON STETINA, Etc., et al., Appellees.
Nos. 64237, 64251 and 64252.
Supreme Court of Florida.
May 16, 1985.
Rehearing Denied August 29, 1985.
*784 Talbot D'Alemberte, Charles W. Ehrhardt, Richard B. Collins of Perkins and Collins, Tallahassee and Jeffrey B. Crockett and Samuel J. Dubbin of Steel, Hector and Davis, Miami, for Florida Patient's Compensation Fund.
William H. Lefkowitz and David M. Orshefsky of Ruden, Barnett, McClosky, Schuster and Russell, Fort Lauderdale, Steven R. Berger and Bernard and Mauro, Miami, for Florida Medical Center.
Sheldon J. Schlesinger, P.A., Fort Lauderdale, and Joel D. Eaton of Podhurst, Orseck, Parks, Josefsberg, Eaton, Meadow and Olin, Miami, for appellees.
Bruce Culpepper and F. Townsend Hawkes of Culpepper, Beatty and Turner, Tallahassee, and Richard A. Sherman, Fort Lauderdale, amicus curiae for The Florida Medical Malpractice Joint Underwriting Ass'n.
R.J. Beckham of Beckham and McAliley, Jacksonville, amicus curiae for John E. Mathews and Gwendolyn G. Mathews.
James E. Tribble and Diane H. Tutt of Blackwell Walker Gray Powers Flick & Hoehl, Miami, amicus curiae for Florida Defense Lawyers Ass'n.
PER CURIAM.
This is an appeal from Florida Medical Center, Inc. v. Von Stetina, 436 So.2d 1022 (Fla. 4th DCA 1983), in which the Fourth District Court of Appeal affirmed a $12.47 million medical malpractice verdict and held unconstitutional sections 768.54(2)(b), 768.54(3)(e)3, and 768.51, Florida Statutes (1981), which relate to hospital liability limitation and the method to be used by the Florida Patient's Compensation Fund ("Fund") in paying final judgments. *785 The district court upheld the constitutionality of section 768.56, Florida Statutes (1981), which authorizes the trial court to award reasonable attorney's fees to the prevailing party in medical malpractice cases, but reduced the fee awarded to the appellees' attorney from $4.4 million to $1.5 million. We have jurisdiction, article V, section 3(b)(1) and (3), Florida Constitution. We reverse the decision of the district court holding the subject statutes unconstitutional. We also vacate the judgment and remand for a new trial.
On November 26, 1980, Von Stetina, then 27 years of age, was injured in an automobile accident. She was taken to the emergency room at Florida Medical Center, where doctors determined that she had sustained abdominal injuries and a fractured femur and wrist, but no serious head or neurological injuries. Shortly after she arrived at the medical center, a surgeon removed her spleen and portions of her liver and pancreas. At trial, the surgeon testified that Von Stetina came through the operation "very nicely" and that the prognosis for her recovery was good.
Following the operation, Von Stetina was placed in the hospital's intensive care unit and connected to a mechanical ventilator to assist her in breathing. She was taken off the ventilator the next day because she could breathe adequately on her own. Although heavily sedated, she was able to communicate with her family and nurses. On December 1, she underwent trauma-induced respiratory distress, a condition which is not uncommon for post-surgery patients. She was then placed on a ventilator which is designed to breathe for the patient, rather than to merely assist the patient in breathing. A muscle-paralyzing drug was administered to temporarily paralyze Von Stetina so as to avoid malfunctions, patient-machine disconnections, and air supply interruptions which may occur when a patient "fights" this type of ventilator. Testimony indicated that Von Stetina needed a dose of the drug every forty-five minutes to ensure her compatability with the ventilator. Von Stetina's hospital chart shows that on the morning of December 3, the final dosage of the muscle-paralyzing drug was administered at 1:30 a.m. No notations were recorded in her chart after 2:00 a.m. At 3:28 a.m., while obtaining medication for another patient in the intensive care unit, a nurse observed that Von Stetina's cardiac monitor revealed a dangerously low heart rate. She immediately initiated a "code blue" emergency process during which Von Stetina's heartbeat was restored. The evidence disclosed that Von Stetina suffered severe brain damage because of an interruption of her oxygen supply. The hospital's chief of staff testified that tests reflected an oxygen loss occurred during the critical period of time, indicating there had in fact been a respirator malfunction or disconnection. The hospital presented evidence that Von Stetina's brain damage could have been caused by respiratory distress rather than by a respirator malfunction and that Von Stetina lacks capacity to appreciate the tragedy that has befallen her.
Von Stetina offered evidence that she feels pain and reacts to it with facial grimaces and contortions and by crying out, that she recognizes and reacts to people, and that she responds to music, affection, and the touch of a human hand. Von Stetina also introduced into evidence, over defense counsel's objection, a nurses' journal article entitled "Just Breathing," which had been written by a nurse and was part of the training materials used in an in-service program offered by the hospital. The article, purportedly based on experiences of ventilator patients, evokes the mental trauma of total dependence on a ventilator and paralysis required for effective ventilation.
After sustaining brain damage, Von Stetina was blinded in one eye by the hospital's failure to keep the eye lubricated properly and taped shut. In addition, her partially healed leg was refractured without explanation. The evidence is unrefuted that these later injuries were caused by substandard care. The evidence further establishes that Von Stetina has a life expectancy of 40 years, but that her quality *786 of life can be best enhanced through round-the-clock nursing care.
The jury found that the negligence of the hospital caused Von Stetina's condition and, in a special verdict, determined the component damages to be as follows:

 Past medical and nursing care $ 125,000
 Future medical and nursing
 care 7,536,000
 Past loss of earnings 16,250
 Future loss of earnings 663,000
 Past pain and suffering 133,000
 Future pain and suffering 4,000,000
 _________
 Total $12,473,250

Although the hospital continues to contest the validity of the jury's determination of liability, the Fund does not, conceding that evidence of negligence was sufficient for the jury to find the hospital liable.
In entering judgment in accordance with the verdict, the trial court held unconstitutional the portion of section 768.54(2)(b) that modifies the law on joint and several liability and shifts to the Fund the obligation to pay the portion of any judgment that exceeds $100,000. The court also found unconstitutional section 768.54(3)(e)3, as it existed in 1981, which restricted the Fund's obligation to pay "not more than $100,000 per person per year until the claim has been paid in full," and refused to apply the 1982 amendment to that section, which eliminates the $100,000 maximum pay-out. The trial judge found the above sections unconstitutional on the grounds they attempt to limit the court's inherent power to enforce judgments and violate both the equal protection and due process clauses of the Florida and United States Constitutions. The trial judge also found unconstitutional section 768.51, Florida Statutes (1981), which provides for the Fund to compensate claimants whose future losses exceed $200,000 in a manner to be determined by the court, because it "impermissibly encroaches upon the inherent power of this court to enter and enforce its judgments," and "arbitrarily and invidiously discriminates against medical malpractice victims who have suffered damages in excess of $200,000."
In considering the attorney's fee for Von Stetina's counsel, the trial court upheld the constitutionality of section 768.56, Florida Statutes (1981), which provides for the prevailing party to be awarded attorney's fees in malpractice actions. Von Stetina's counsel had contracted to represent her for a forty percent contingency fee. In setting the fee at $4.4 million, the trial judge stated that he relied heavily upon the contingency factor. Two expert witnesses produced by Von Stetina testified that fees of $5 million and $4.988 million would be appropriate, the latter figure equalling forty percent of the amount of the verdict.
The district court of appeal agreed with the trial court that sections 768.54(2)(b) and (3)(e)3 and 768.51, Florida Statutes (1981), are unconstitutional, and adopted to a large extent the trial court's reasoning. The district court found that the nurses' journal article was erroneously admitted because the appellant did not lay a predicate that Von Stetina or any other patient had actually experienced the thoughts and emotions depicted under similar circumstances. It found the evidence to be cumulative and concluded that the error was harmless. The district court also refused to set aside the jury award as excessive, recognizing that it was "admittedly at the maximum of any reasonable range," but concluding that "[f]orty years' imprisonment within a helpless body racked with pain and requiring nearly $200,000 worth of medical care each year can hardly be equalled by all the tortures of the damned." 436 So.2d at 1024.
The district court also affirmed the trial court's holding that section 768.56 was constitutional, but concluded that the trial court's award of a $4.4 million attorney's fee was an "abuse of discretion under the facts," determining that the trial judge had accorded too much weight to an appropriate contingency percentage, while giving only limited consideration to the time expended by counsel in obtaining this result. Id. at 1032. The district court reduced the fee from $4.4 million to $1.5 million.
The issues presented to this Court on mandatory review were (1) whether the *787 statutory scheme providing for the Fund to pay judgments for health care providers and physicians is constitutional under the provisions of section 768.54(2)(b), section 768.51, and section 768.54(3)(e)3, either as enacted in 1976 or as amended in 1982; (2) whether it constituted prejudicial error for the trial court to admit into evidence the article utilized as part of the training materials for the intensive care unit nurses in the appellant hospital; (3) whether the damages awarded for pain and suffering in this case are excessive; and (4) whether section 768.56, which directs the court to set reasonable attorney's fees for the prevailing party, is constitutional, and, if so, whether the attorney's fee awarded in this case is reasonable.

Part I: Constitutionality of Florida Patient's Compensation Fund Pay-Out Provisions.
Before evaluating the constitutionality of sections 768.54(2)(b), 768.54(3)(e)3, and 768.51, we must first determine whether section 768.54(3)(e)3 as enacted in 1976, or as amended in 1982, is applicable to this case. The original enactment provides for the Fund to pay, in place of a health care provider, the portion of any judgment which exceeds $100,000, but limits the payment to no more than $100,000 per person per year until the claim has been paid in full.[1] Assuming the 1976 provision is applicable, it is clear that the statute would prohibit the Fund from paying the full amount of the annual medical expenses of Von Stetina, determined by the jury to be $188,400. In 1982, while this cause was pending in the trial court, the "cap" on payments was eliminated by an amendment to section 768.54(3)(e)3.[2] The amendment did not become effective until two months after the entry of the trial court's judgment, but it has been in effect while this cause has been pending on appeal.
The Fund contends that an appellate court must apply the most recent version of the statute when it is the law in effect at the time of the appellate court's final decision. The district court rejected that view, finding that the statutory change affects a substantive matter and that its application to the present case constitutes an impermissible retroactive application.
We disagree with the district court. The judgment awarded in favor of Von Stetina is not final until the case has been disposed of on appeal. An appellate court is generally required to apply the law in effect at the time of its decision. See Hendeles v. Sanford Auto Auction, Inc., 364 So.2d 467 (Fla. 1978); Florida East Coast Railway v. Rouse, 194 So.2d 260 (Fla. 1966); Eastern Air Lines, Inc. v. Gellert, 438 So.2d 923 (Fla. 3d DCA 1983); Department of Administration v. Brown, *788 334 So.2d 355 (Fla. 1st DCA 1976). In City of Lakeland v. Catinella, 129 So.2d 133 (Fla. 1961), this Court said:
Remedial statutes or statutes relating to remedies or modes of procedure, which do not create new or take away vested rights, but only operate in furtherance of the remedy or confirmation of rights already existing, do not come within the legal conception of a retrospective law, or the general rule against retrospective operation of statutes.
Id. at 136 (citing Cunningham v. State Plant Board, 112 So.2d 905 (Fla. 2d DCA), cert. denied, 115 So.2d 701 (Fla. 1959)). We accept the Fund's view that the 1982 amendment to section 768.54 is remedial in nature. The amendment does not alter the size of the judgment in favor of Von Stetina; rather, it prescribes the method by which the judgment is to be paid. We find that the statute simply changes the form of the enforcement and does not substantially impair any existing rights. See Village of El Portal v. City of Miami Shores, 362 So.2d 275 (Fla. 1978).
Having determined that we should apply the 1982 version of section 768.54(3)(e)3, we will proceed to consider its constitutionality along with the constitutionality of sections 768.54(2)(b) and 768.51, Florida Statutes (1981). Initially, however, the reason for the creation of the Fund must be fully understood. In 1975, the Florida Legislature instituted the Fund as a non-profit entity to provide medical malpractice protection to the physicians and hospitals who join it, as well as a method of payment to medical malpractice plaintiffs. See ch. 75-9, Laws of Fla. The Fund provides a statutory scheme of pooling the risk of losses and placing major losses in the entity that can best spread the risk of loss as well as control the conduct of those at fault. Department of Insurance v. Southeast Volusia Hospital District, 438 So.2d 815 (Fla. 1983), appeal dismissed, ___ U.S. ___, 104 S.Ct. 1673, 80 L.Ed.2d 149 (1984). In its preamble to the 1976 amendment, the legislature summarized its public policy findings with respect to the need for the enactment. It reads, in part, as follows:
WHEREAS, despite the responsive and responsible actions of the 1975 session of the legislature, professional liability insurance premiums for Florida physicians have continued to rise and ... such insurance, even at exorbitant rates, is becoming virtually unavailable in the voluntary private sector, and ... this insurance crisis threatens the quality of health care services in Florida ... and... this crisis also poses a dire threat to the continuing availability of health care in our state .. . and ... our present tort law/liability insurance system for medical malpractice will eventually break down ... [and] fundamental reforms of said tort law/liability insurance system must be undertaken, and ... the continuing crisis proportions of this compelling social problem demand immediate and dramatic legislative action... .
Ch. 76-260, Laws of Fla. See also ch. 75-9, Laws of Fla.
Von Stetina contends that the legislature cannot constitutionally limit the liability of a health care provider to $100,000 and transfer the responsibility to pay the portion of a judgment which is in excess of $100,000 from the health care provider to the Fund. In addition, she argues the statutory scheme violates the separation of powers by interfering with the authority of the courts to enforce their own judgments. We disagree. The Florida Patient's Compensation Fund provides health care providers with medical malpractice liability coverage for the benefit of both the health care providers and those members of the public who become victims of medical malpractice. In Southeast Volusia Hospital District, we upheld the concept of the Fund and its assessment mechanism. We find the statutory scheme does not deny plaintiffs recovery of judgments, but in fact is designed, in part, to ensure that sufficient funds exist to pay substantial judgments to medical malpractice victims. The scheme that makes the Fund party to a medical malpractice action and responsible for portions of awards in excess of $100,000 does not *789 substantially violate or change any of the plaintiff's vested rights. We caution, however, that we do not address in this action the constitutional right of a plaintiff to levy against a health care provider when the Fund is fiscally incapable of or otherwise prohibited from paying validly entered judgments within a reasonable time because of inadequate rates and assessments.
Von Stetina also attacks as unconstitutional section 768.51, which provides for the payment of future medical expenses and future lost wages as they are actually incurred. We find that section 768.51 establishes a reasonable means for medical malpractice victims to recover future losses. Traditionally, future damages resulting from tort liability have been compensated by means of a lump sum judgment. For many years, however, commentators have suggested that legislation providing for periodic payments of future damages in personal injury awards would benefit both plaintiffs and defendants. See National Conference of Commissioners on Uniform State Laws, Model Periodic Payment of Judgments Act (1980); Henderson, Periodic Payments of Bodily Injury Awards, 66 A.B.A.J. 734 (1980).
We find the legislation at issue does not implicate a fundamental right or suspect classification. See Pinillos v. Cedars of Lebanon Hospital Corp., 403 So.2d 365 (Fla. 1981); Woods v. Holy Cross Hospital, 591 F.2d 1164 (5th Cir.1979). Cf. Carson v. Maurer, 120 N.H. 925, 424 A.2d 825 (1980). We strongly adhere to the view that "the judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." City of New Orleans v. Dukes, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976). So long as the legislative measure is rationally related to legitimate state interests, we must not substitute our judgment for that of the legislature with respect to the need for, or wisdom of, a legislative enactment. See State v. Bales, 343 So.2d 9 (Fla. 1977). We conclude that the legislature could reasonably find that the increasing costs of medical malpractice insurance posed a threat to the continued availability and adequacy of health care services, and that the public health could be protected by the enactment of the subject measures, which were designed to reform the medical malpractice insurance system.[3]Cf. Pinillos, 403 So.2d at 368. The legislature has designated a source to pay medical malpractice judgments and has created a system of paying future damages. It has not modified the dollar amount of medical malpractice judgments that can be rendered. In our view, such action is within the constitutional prerogative of the legislature. We find nothing in the transfer of liability provision or the periodic pay-out provisions as applied to this case that constitutionally invalidates the statutory scheme. We specifically uphold the constitutionality of sections 768.54(2)(b), 768.54(3)(e)3, and 768.51, Florida Statutes (1981).

Part II: Admissibility of Nurse Training Materials
The Fund and the hospital contend that the nurses' journal article was erroneously admitted by the trial judge because it was fictional, it was not presented by the author, and it was not shown that the thoughts occurred in the mind of Von Stetina or any other patient. They assert that the district court of appeal correctly found that the admission of the article was error but incorrectly concluded that the error was harmless because it was "cumulative" in that "[t]here was so much other deeply moving evidence." 436 So.2d at 1033. Appellants argue that it resulted in a prejudicial impact on the damages awarded in this case.
The short story read into the record and submitted in evidence to the jury was inadmissible *790 because it was not relevant to a material issue in the litigation.
Nothing in the story focuses on the actions of the attendant nurse in terms of the nurse's function. Nothing in the story establishes a standard of care or dictates a procedure for attending ventilated patients. Rather, it speaks of a conscious, ventilated patient's perception of the experience and the helplessness involved. The only "training" this short story would efficate is affective training  development of empathy. Plaintiff's counsel himself so characterized it.
A cause of action does not exist for lack of empathy except, perhaps, for negligent or intentional infliction of emotional distress. But even assuming a cause of action in medical malpractice could be brought for lack of empathy in violation of the standard of care required, this case was not predicated on that theory. In very carefully documented evidence elicited from a series of witnesses, plaintiff's counsel proved that every staff member available at the time of Von Stetina's mishap was actively involved in the delivery of necessary care to patients who were more acutely in need than Von Stetina appeared to be at the last recorded vital-sign monitoring before the event. There was simply no attempt to prove that the nurses callously or even negligently ignored the victim. Plaintiff proved that the nurses could not be two places at once, regardless of the degree of care and concern they felt.
Finally, plaintiff's attorney elicited from every nurse on duty that night her background and training. Not one had received training at Florida Medical Center. There is no evidence in the record that any of the nurses staffing the ICU that night were ever exposed to the document.
The story did not establish a technical standard of care by which the nurses' actions could be measured. The evidence presented showed that the nurses did not neglect Von Stetina out of lack of empathy, but, if at all, from understaffing which created a demand for their immediate services elsewhere. The relevance of the story as a training tool is not established. Because it was irrelevant, it was inadmissible.
Further, we cannot find this to be harmless error. As plaintiff's counsel brought out, the intended effect of the story was to touch the emotions of the nurses so as to create empathy. This is unarguably the effect its admission into evidence was intended to create in the jurors. The story essentially puts the reader in the patient's situation and evokes from the reader or listener the terror, pain and helplessness felt by a patient. However, this is the trauma caused by adequate and entirely proper treatment. It is not pain and suffering for which a patient may recover money damages. Neither does the emotional response to perceived pain and terror add to the jury's ability to weigh the disputed facts in determining liability.
The jurors were presented with evidence designed to arouse emotions and they were assured that this evidence was relevant and material to their determination of the issues before them. The jurors had no reason to disregard their empathetic response and we must assume that that response was reflected to some extent in the verdict rendered. Mere sympathy cannot sustain a judgment. A juror is charged with the duty to weigh evidence and to find fact. The jury system should not function on emotion, but on logic. The introduction of this highly emotional, irrelevant document must have colored the jury's approach to the evidence. As such the admission of the document cannot have been harmless error. The judgment must be vacated and petitioners granted a new trial.

Part III. Damage Award
Because we vacate the judgment in its entirety, we need not address the issue of damages at this time.

Part IV. Attorney's Fees
We have recently addressed the issue of attorneys' fees and the constitutionality of the underlying statute in Florida Patient's Compensation Fund v. Rowe, 472 So.2d 1145 (Fla. 1985), which will control the consideration *791 of the award of attorneys' fees, if any, in further proceedings.
The decision of the district court is reversed and the case is remanded for a new trial.
It is so ordered.
ALDERMAN, McDONALD, EHRLICH and SHAW, JJ., concur.
BOYD, C.J., concurs in part and dissents in part with an opinion.
OVERTON, J., concurs in part and dissents in part with an opinion, in which ADKINS, J., concurs.
EHRLICH, J., participates in parts I, II & III with an opinion.
BOYD, Chief Justice, concurring in part and dissenting in part.
I concur with the majority that the nurses' training manual was improper as evidence and should not have been admitted into evidence. I find, however, that the evidence showing medical malpractice and establishing liability and general medical and economic damages was so clear and so substantial that the improper admission of the manual was harmless error. Thus I dissent from the Court's judgment awarding a new trial.
With regard to the award of $4,000,000 for future pain and suffering, I conclude that the damages found are excessive and would reduce them to $2,000,000.
OVERTON, Justice, concurring in part, dissenting in part.
I fully concur with the majority's determination that sections 768.54(2)(b), 768.54(3)(e)3, and 768.51, Florida Statutes (1981), are constitutional.
I dissent from the vacation of the judgment for both liability and damages. I find that the nurses' journal article was properly admitted and I would approve the jury's total damage award. Assuming, for the reasons expressed by the majority, the article's admission was error, I strongly believe the majority should have applied the harmless error test, affirmed the finding of liability and the award for economic damages, and found harmful error only as to the award for pain and suffering.
I am well aware that a verdict of the size awarded in this cause would not have been contemplated a few years ago, even under these tragic facts. It is exceedingly important for the public to realize that the enormity of this award is largely attributable to the increased costs of medical care in our present day society and to the advances in medicine. The economic damages in the instant case, which total in excess of $8 million, consist almost entirely of future medical expenses necessary to maintain Susan Ann Von Stetina for her 40-year life expectancy. I am deeply concerned that the holding of the majority will unjustly delay payment for the medical services necessary to maintain Von Stetina, to which I find she is clearly entitled under the evidence presented in this cause. The factual circumstances of the instant case graphically demonstrate the need for a legislative malpractice insurance scheme that will ensure that the victim, the health care provider, and the physician are each treated fairly, and that the availability of reasonable health care services is not adversely affected.

Admissibility of Nurses' Journal Article
I disagree with the majority's conclusion that the nurses' journal article was irrelevant and consequently inadmissible. To be relevant, evidence "must have a logical tendency to prove or disprove a fact which is of consequence to the outcome of the action." C. Ehrhardt, Florida Evidence 401.1 at 83 (2d ed. 1984). In establishing a medical standard of care, I believe it is relevant to present materials used in educational programs conducted for personnel charged with the patient's care. The appellant hospital admittedly utilized the article in issue in a nurses' training program. The distribution of the article was clearly intended to educate the nurses who were employed in this hospital's intensive care facility with respect to the need for strict monitoring of ventilator patients. The appellants, *792 in their brief, concede that the exhibit was "directed to a critical issue"  the extreme dependence of a respirator patient on hospital personnel  but object to its admission on the grounds that the article is sensational and portrays respirator patients as being "panic-stricken," making the jury more likely to award a "huge" amount of damages. In my view, this article, because of its use as a training tool, is probative of a standard of care required of intensive care personnel in the appellant hospital, and its probative value outweighed any prejudicial effect in this trial.
I find no merit in appellants' assertion that the article should have been excluded as hearsay. This was a material out-of-court writing offered to show information that the appellant hospital believed relevant to the education of nurses charged with monitoring respirator patients. It was clearly designed to affect the conduct of this hospital's intensive care unit nurses. My view is consistent with E. Cleary, McCormick on Evidence, § 249 (3d ed. 1984), which states:
When it is proved that D made a statement to X, with the purpose of showing the probable state of mind thereby induced in X, such as being put on notice or having knowledge, or motive, or to show the information which X had as bearing on the reasonableness ... of the subsequent conduct of X .. . the evidence is not subject to attack as hearsay.

(emphasis added; footnotes omitted). For these reasons, I would find the article was properly admitted and would proceed to address the reasonableness of the verdict for pain and suffering and the loss of ability to lead a normal life.

Reasonableness of the Verdict
In affirming the trial court's finding of reasonableness, the district court of appeal stated that the verdict was "admittedly at the maximum of any reasonable range," but found that "[f]orty years' imprisonment within a helpless body racked with pain and requiring nearly $200,000 worth of medical care each year can hardly be equalled by all the tortures of the damned." 436 So.2d at 1024.
The Fund and the hospital contend that the award to Von Stetina of $4.1 million for pain and suffering is unsupported by this record because "Von Stetina, whose brain is dead and who hangs on to life at a level less than fully human, is unaware of the extent of her bank account." They further assert that Von Stetina is currently receiving complete and ideal care and that $188,000 per year in maintenance costs is more than adequate to provide for all her needs. They allege that our decision in Loftin v. Wilson, 67 So.2d 185 (Fla. 1953), stands for the proposition that when a pain and suffering award will yield a return which exceeds the plaintiff's annual earnings prior to his injury, the amount of the award is excessive and requires reversal. They also argue that we should apply Flannery v. United States, 718 F.2d 108 (4th Cir.1983), cert. denied, ___ U.S. ___, 104 S.Ct. 2679, 81 L.Ed.2d 874 (1984), in which the federal court held that a $1.3 million award for "loss of enjoyment of life" to a comatose patient cannot be justified as compensatory damages as a matter of law, because the patient is not aware of his or her status of life.
I would expressly reject the Flannery rule. In Florida, jury is instructed that it may award damages "for bodily injury, pain and suffering, disability, disfigurement, mental anguish, and the loss of capacity for the enjoyment of life to be experienced in the future." Fla.Std.Jury Instr. (Civ.) 6.2(a). I am unable to accept the proposition that a comatose patient may not, as a matter of law, recover compensatory damages for the loss of capacity for the enjoyment of life. Under such a rule of law, damages awarded to the most grievously injured individuals would be reduced solely because of the nature and seriousness of the victims' injuries. One authority has stated:
A plaintiff who sustained a serious enough impact to cause loss of consciousness will almost surely manifest some other sign or effect of injury to which a *793 claim for pain and suffering could properly be appended. Should the injured person have been rendered permanently comatose, the pain and suffering issue would pale next to the claims arising from the permanent injury and total destruction of the victim's capacity to ever again engage in activities of life.

M. Minzer, Damages in Tort Actions § 4.21[3][a](1984) (emphasis added).
Further, under the particular facts of this case, I do not believe that the Flannery holding is applicable. There is no question that Von Stetina has been deprived of "life" in all but the most basic sense of that word. Yet, competent evidence adduced at trial established that she responds to external stimuli  she reacts to people, music, and pain  making her plight all the more tragic. I would also find that the application of the Loftin holding does not compel the conclusion that the damage award was unreasonable. Although the plaintiff's annual earnings should be considered in determining whether a verdict for pain and suffering and lack of ability to lead a normal life is excessive, I disagree with appellants' assertion that it is the single controlling factor.
I recognize that a $4.1 million verdict for future pain and suffering and loss of ability to lead a normal life is initially difficult to comprehend. However, if Von Stetina had been paralyzed for only one year, and the jury had rendered a verdict of $288,000  $188,000 of which was for medical expenses and the remainder for pain and suffering and the lack of ability to lead a normal life for one year  that perception would change. Few, if any, courts would find that verdict unreasonable. The size of the verdict in this case is principally attributable to the fact that Von Stetina will suffer this brain-damaged condition throughout her forty-year life expectancy. I conclude, as did the district court, that the damage award does not exceed the range for which the jury could properly render a verdict under the tragic facts of this case.

Application of Harmless Error to Liability and Economic Damages
Assuming the correctness of the majority's holding that the nurses' journal article was erroneously admitted, I conclude that the harmless error rule must be applied, and that its application would require an affirmance of the jury's finding of liability and its award of damages for past and future medical and nursing care, as well as past and future loss of earnings. I would recognize that, if the article was erroneously admitted, the error was harmful only to the pain and suffering award. This state, along with the other 49 states and the federal judicial system, has a harmless error statute that we are directed to apply. Section 59.041, Florida Statutes (1983), provides that a judgment should not be set aside or reversed, or a new trial granted, for improper admission of evidence unless the court finds the error resulted in a "miscarriage of justice."
The application of the harmless error statute requires an appellate court to consider the entire record and determine whether the verdict was affected by the error. Tests have been clearly established for this doctrine's application in criminal cases. The test for nonconstitutional error in criminal cases is whether, after considering the entire record, the appellate court can find "with fair assurance" that the "judgment was not substantially swayed by the error." Kotteakos v. United States, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). When constitutional error is involved, the appellate court must determine, after considering the entire record, whether there is "a reasonable possibility" that the error contributed to the verdict. Before the error can be held harmless, the court must find it was "harmless beyond a reasonable doubt." See Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705, reh'g denied, 386 U.S. 987, 87 S.Ct. 1283, 18 L.Ed.2d 241 (1967); Fahy v. Connecticut, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963). See also R. Traynor, The Riddle of Harmless Error (1970). This Court has never expressly *794 set forth a harmless error test for the appellate courts of this state to apply in civil cases. For the purpose of this case, utilizing the nonconstitutional criminal test set forth in Kotteakos, I have no difficulty concluding with "fair assurance" that the nurses' article did not affect the verdict on liability or the award for special damages.
In my view, the record contains overwhelming evidence to support the finding that the appellant hospital negligently caused Von Stetina's injury. Significantly, the Fund argues that reversal is mandated because the article was calculated to inflame the jury by portraying respirator patients as "panic-stricken" and thereby inflate the damages award, but it does not contest the hospital's liability in this proceeding. In fact, the Fund acknowledges in its brief that the article was cumulative with respect to establishing the dependence of respirator patients. After a thorough examination of the trial record, I conclude, with fair assurance, that the admission of the article did not affect the verdict on liability, and the failure to affirm the verdict on this issue results in injustice.
I reach the same conclusion in applying the test to the jury's award for past and future medical care and lost earnings. The jury rendered its verdict on a specialized form which itemized the damages as follows:

 Past medical and nursing care $ 125,000
 Future medical and nursing
 care 7,536,000
 Past loss of earnings 16,250
 Future loss of earnings 663,000
 Past pain and suffering 133,000
 Future pain and suffering 4,000,000
 __________
 Total $12,473,250

The appellants assert there is a "fair inference" that the article affected the judgment for medical care and lost earnings. They concede, however, that the amount awarded for medical care was supported by the evidence, and they do not contend that the lost earnings award was unreasonable. The only issue relating to the medical care damages was the difference between the cost for providing Von Stetina with round-the-clock LPN nursing care and thrice-daily physical therapy, as opposed to the cost of the institutionalized nursing home care advocated by the appellants. The uncontroverted fact that, under the care Von Stetina was receiving while in the appellant hospital, her leg was refractured and her eye blinded is extremely strong evidence of her need for constant private nursing care. The article did not affect the jurors' judgment on this issue and the majority's reversal on this point also results in injustice.
For the reasons expressed, I would uphold the judgment and remand for a new hearing on attorney fees under the standards enunciated in Florida Patient's Compensation Fund v. Rowe, 472 So.2d 1145 (Fla. 1985). If I were to accept the majority's finding that admission of the nurses' journal article was erroneous, I would apply the harmless error rule to liability and the economic damage award, and remand for a new trial on the issue of general damages and for a new hearing on the matter of attorney fees after the new trial is completed.
ADKINS, J., concurs.
EHRLICH, Justice, participating in parts I, II and III.
When this case was orally argued, I recused because of the issue involving attorney's fees in section 768.56. I had been a witness in the trial of a case wherein a former law partner, John E. Mathews, Jr., was plaintiff, and a number of doctors were defendants. The trial of that case resulted in a favorable verdict for the doctors, who, post-judgment sought to assess attorney's fees against plaintiff Mathews pursuant to section 768.56. While the trial court refused to assess attorney's fees on constitutional grounds, the DCA in Polhman v. Mathews, 440 So.2d 681 (Fla. 1st DCA 1985), reversed the trial judge on that issue, and discretionary review was sought and accepted by this Court. Counsel for Mathews filed an amicus brief in this case on that one issue. This was the reason for my recusal.
*795 At a point in time after the Court, without my participation, had resolved the issues of the constitutionality of section 768.56 and the reasonableness of the attorney's fees awarded to plaintiff's counsel, I was requested by the Court to participate in the resolution of the remaining issues and I agreed to do so. I have listened to the recording of oral argument and have viewed the visual recording shown to this Court during oral argument and have studied the briefs submitted and have participated in conference discussions with the other members of this Court on all issues except the one dealing with attorney's fees.

ON REHEARING
PER CURIAM.
We express our full approval of the explanation given by Justice Ehrlich for his denial of disqualification and our strong belief that his participation was proper and ethical under the circumstances of this case.
BOYD, C.J. and ADKINS, OVERTON, ALDERMAN, McDONALD, and SHAW, JJ., concur.
The Motions to Withdraw Decision and Request for Oral Argument are hereby denied.
BOYD, C.J., and ADKINS, OVERTON, ALDERMAN, McDONALD, EHRLICH and SHAW, JJ., concur.
The Motion for Rehearing is hereby denied.
ADKINS, ALDERMAN, McDONALD, EHRLICH and SHAW, JJ., concur.
BOYD, C.J., and OVERTON, J., dissent.

DENIAL OF SUGGESTION OF DISQUALIFICATION
EHRLICH, Justice.
Pursuant to procedures set forth in In re Estate of Carlton, 378 So.2d 1212 (Fla. 1979), I have considered the legal sufficiency of this suggestion of disqualification and pondered deeply the propriety of retroactively withdrawing from this case under the circumstances set forth. I decline to do so.
I am not, as a matter of law, required to disqualify myself. From the earliest time this cause was before the Court, I made known my involvement with Mathews v. Pohlman, 472 So.2d 1152 (Fla. 1985). I recused myself on that case and, because Mathews filed an amicus brief on the issue of attorneys' fees in Von Stetina, I recused myself on this case as well. The important distinction between my recusal here and the judge's recusal in Kells v. Davidson, 102 Fla. 684, 136 So. 450 (1931), on which the suggestion of disqualification relies, is subtle but conclusive.
In Kells, the judge was recused because of consanguinity with one of the defendants. After the death of that defendant, the judge "requalified" to hear the case. The Court held that a change of circumstances could not remove an acknowledged bar to consideration of a case. The Court expressly recognized that the policy underlying that rule was to avoid even the appearance of judicial impropriety and to prevent bad-faith manipulation of cases in order to obtain a "friendly" judge.
Here, I recused for cause on only one issue of Von Stetina. That issue was legally and procedurally severable from the remaining issues. As a matter of judicial economy, I withdrew from consideration of any issue in that case. There was no legal bar to my considering issues relating to liability and damages, but my presence during argument and conference on those issues and my recusal during argument and conference on the attorneys' fees would have been awkward and inefficient. As I noted in my explanation appended to the Court's opinion in Von Stetina, there came a time when judicial economy would no longer be served by my withdrawal from consideration of issues unrelated to attorneys' fees in this case. Rather, as a matter of judicial economy, it was necessary that I consider these issues. No legal bar had been removed. There was no change in *796 circumstances which allowed me to "requalify." I have never considered any aspect of the issue from which I was legally and ethically required to recuse myself.
Furthermore, the policy underlying the Kells decision is satisfied. There can be no appearance of impropriety because the issues on which I participated are irrelevant to the issue on which I was recused. Neither does my participation invite bad-faith manipulation of a judicial panel. Rather, allowing a severable issue to be considered and decided separately forecloses the possibility that cases will be manipulated to include issues which would require recusal of a judge perceived as hostile to a party or a result.
In considering the propriety of withdrawing, I analyzed those policies just discussed. I firmly believe it is important not only that justice be done but that justice appear to be done. For that reason, I feel compelled to address a concern expressed in the suggestion of disqualification which is more personal than the legal issue. Appellee's counsel noted that I stood for merit retention while this case was pending before the Court. Counsel expresses concern that because of my recusal I was no longer "protectively wrapped" by my judicial role in this case and thus could be "exposed to contamination," that is, I may have been, or appeared to have been, the object of ex parte communication about this case while standing for merit retention. This fear bespeaks an imperfect understanding of my judicial oath and the Code of Judicial Conduct, by which I am bound. When I recuse myself in this or any other case, I do not step down from the bench. I remain a Justice of the Supreme Court of Florida, bound by my oath and bound by the Code of Judicial Conduct in regards to any case before this Court, whether or not I participate in its consideration. I am bound by Canon 3A(4) & (6) which proscribe ex parte communication or public comment concerning a pending or impending proceeding. Were I, in the course of "stumping the state for reelection" to solicit or allow the kind of comment to which counsel alludes, I would be guilty of a grievous breach of judicial ethics.
Counsel states that whether or not such comment occurred, the appearance of impropriety is present. I cannot agree. I have faithfully followed my oath and the Code of Judicial Conduct. I have done only that which I was allowed by law and required by political exigency to do. If standing for merit retention raises the assumption in the eyes of the Bar and the public at large that judicial misconduct has occurred, no judge may ever ethically seek to retain his office.
I fairly and fully considered only those issues which were unrelated to the single issue requiring my recusal. I reject the suggestion that I am legally or ethically required to disqualify myself.
NOTES
[1] The applicable portion of the 1976 statute is as follows:

3. A person who has recovered a final judgment or a settlement approved by the Fund against a health care provider who is covered by the Fund may file a claim with the Fund to recover that portion of such judgment or settlement which is in excess of $100,000 or the amount of the health care provider's basic coverage, if greater, as set forth in paragraph (2)(b). In the event an account for a given year incurs liability exceeding $100,000 to all persons under a single occurrence, the persons recovering shall be paid from the account at a rate not more than $100,000 per person per year until the claim has been paid in full, except that court costs and reasonable attorney's fees shall be paid in one lump sum within 90 days after the settlement or judgment is rendered. Such fees shall not reduce the amount of the annual award.
[2] The amended provision reads as follows:

3. A person who has recovered a final judgment against the Fund or against a health care provider who is covered by the Fund may file a claim with the Fund to recover that portion of such judgment which is in excess of the applicable amount set forth in paragraph (2)(f) or the amount of the health care provider's basic coverage, if greater, as set forth in paragraph (2)(b). The amount of liability of the Fund under a judgment, including court costs, reasonable attorney's fees, and interest, shall be paid in a lump sum, except that any claims for future special damages, as set forth in s. 768.48(1)(a) and (b), shall be paid periodically as they are incurred by the claimant. If a claimant dies while receiving periodic payments, payment for future medical expenses shall cease, but payment for future wage loss, if any, shall continue at a rate of not more than $100,000 per year.
[3] A medical malpractice periodic payment provision similar to but apparently more restrictive than Florida's was recently approved by the Supreme Court of California in American Bank & Trust Co. v. Community Hospital, Inc., 36 Cal.3d 359, 683 P.2d 670, 204 Cal. Rptr. 671 (1984).