(No. 62876.—

BERNICE BERNIER, Appellee, v. ROLAND W. BURRIS, State Comptroller *et al.*, Appellants.

*Opinion filed June 20, 1986.—Rehearing denied September 26, 1986.*

222

SIMON, J., took no part.
RYAN, J., concurring in part and dissenting in part.

Neil F. Hartigan, Attorney General, of Springfield (Roma J. Stewart, Solicitor General, and Michael J. Hayes, Michael V. Casey and Thomas A. Ioppolo, Assistant Attorneys General, of Chicago, of counsel), for appellants.

Leonard M. Ring and Associates, of Chicago (Leonard M. Ring and Leslie J. Rosen, of counsel), for appellee.

Max E. Wildman, Douglas R. Carlson and Martin J. Hatlie, of Wildman, Harrold, Allen & Dixon, of Chicago (Kirk B. Johnson, B. J. Anderson and Susan M. Schmidt, of counsel), for *amicus curiae* the American Medical Association.

Mark D. Deaton and Daniel J. Mulvanny, of Naperville, for *amicus curiae* Illinois Hospital Association.

Saul J. Morse & Associates, Ltd., of Springfield (Saul J. Morse, of counsel); Winston & Strawn, of Chicago (Calvin Sawyier, Clive Topol and Mark Van Cura, of counsel); and Friedman & Koven, of Chicago (John B. Simon and Russ M. Strobel, of counsel), for *amicus curiae* Illinois State Medical Society.

D. Kendall Griffith and Dennis J. Horan, of Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago, for *amicus curiae* Metropolitan Chicago Healthcare Council.

Peter M. Sfikas and Larry R. Eaton, of Chicago (Peterson, Ross, Schloerb & Seidel, of counsel), for *amici curiae* American Dental Association and Illinois State Dental Society.

John M. Cannon, Susan W. Wanat and Ann Plunkett Sheldon, of Chicago, for *amicus curiae* Mid-America Legal Foundation.

Susan W. McGrath and William D. McGrath, of McGrath & McGrath, of Champaign, for *amicus curiae* Champaign County Health Care Consumers.

Asher, Pavalon, Gittler and Greenfield, Ltd., and Anesi, Ozmon, Lewin & Associates, Ltd., all of Chicago (Nat P. Ozmon, Lester Asher, Eugene I. Pavalon, Paul J. Bargiel, William A. Geiser and Richard A. Kimnach, of counsel), for *amici curiae* the Illinois State Federation of Labor and Congress of Industrial Organizations *et al.*

John D. Hayes, of Hayes & Power, of Chicago; and Thomas F. Londrigan, of Londrigan, Potter & Randle, P.C., of Springfield; and James L. Gilbert, of James L. Gilbert & Associates, P.C., of Arvada, Colorado, for *amicus curiae* Trial Lawyers For Public Justice.

Philip H. Corboy, of Chicago, for *amicus curiae* the Chicago Bar Association.

Carl J. Schroeder and Ralph R. Hruby, of Carl F. Schroeder, Ltd., of Wheaton, for *amicus curiae* Illinois Public Action Council.

Robert J. Glenn and David A. Novoselsky, of Chicago, for *amicus curiae* Illinois Trial Lawyers Association.

Richard S. Fleisher, David A. Novoselsky and Todd A. Smith, of Chicago, for *amicus curiae* People's Medical Society.

Robert A. Clifford & Associates, of Chicago (Robert A. Clifford and Robert P. Sheridan, of counsel), for *amicus curiae* Consumer Health Resource Center.

John C. Wunsch, of Chicago (Patrick G. Reardon and Stephen M. Connolly, of counsel), for *amicus curiae* the Illinois State Council of Senior Citizens.

JUSTICE MILLER delivered the opinion of the court:

The plaintiff, Bernice Bernier, brought this action in the circuit court of Cook County challenging the constitutionality of various provisions of Public Act 84—7. Approved June 25, 1985, and effective August 15, 1985, Public Act 84—7 made a number of significant changes to the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, pars. 1—101 through 19c—101) concerning medical malpractice actions. The circuit judge found that the particular provisions challenged by the plaintiff were uncon-

stitutional, and the defendants have appealed that decision directly to this court (103 Ill. 2d R. 302(a)). Numerous *amici curiae* have submitted briefs in this court in behalf of the parties.

The plaintiff, a resident and taxpayer of Cook County, instituted her action as a taxpayer's suit on July 3, 1985. Named as defendants in the action were various State officials, and the complaint sought to enjoin the disbursement and expenditure of public funds for carrying out the various provisions in Public Act 84—7. By her amended complaint the plaintiff attacked the constitutionality of five parts of the legislation—those establishing a system of review panels, providing for the periodic payment of future damages, modifying the collateral-source rule, prohibiting awards of punitive damages, and limiting the amounts of contingent fees. Following an extensive evidentiary hearing, in which both the plaintiff and the defendants presented testimony on the nature and extent of the medical malpractice crisis and the effect that the provisions here may have on litigants, the trial judge found that all five parts challenged by the plaintiff violated a number of State and Federal constitutional guarantees.

Public Act 84—7 amended sections 2—1109, 2—1205, 8—2001, and 8—2003 of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, pars. 2—1109, 2—1205, 8—2001, 8—2003) and added to the Code sections 2—114, 2—611.1, 2—622, 2—1010, 2—1012 through 2—1020, 2—1114, 2—1115, 2—1701 through 2—1719, and 8—2501 (Ill. Rev. Stat. 1985, ch. 110, pars. 2—114, 2—611.1, 2—622, 2—1010, 2—1012 through 2—1020, 2—1114, 2—1115, 2—1701 through 2—1719, 8—2501). These provisions in general are applicable to actions for what is termed "healing art" malpractice, a broad category that is not confined to actions against physicians and hospitals but rather, as some of the provisions indicate, may

also include actions against other health professionals such as dentists or psychologists. See, *e.g.*, Ill. Rev. Stat. 1985, ch. 110, par. 2—622.

We note at the outset that "[t]here is, as this court has frequently emphasized, a strong presumption that legislative enactments are constitutional (*People v. Greene* (1983), 96 Ill. 2d 334, 338; *Cronin v. Lindberg* (1976), 66 Ill. 2d 47, 58), and one who asserts otherwise has the burden of clearly establishing the constitutional violation (*Polyvend, Inc. v. Puckorius* (1979), 77 Ill. 2d 287, 303; *People v. Dale* (1950), 406 Ill. 238, 244.)." (*Sayles v. Thompson* (1983), 99 Ill. 2d 122, 124-25.) Because many of the provisions challenged here are attacked on the same grounds, as violating the due process and equal protection guarantees of both the State and Federal constitutions (see U.S. Const., amend. XIV; Ill. Const. 1970, art. I, sec. 2) and the State prohibition of special legislation (see Ill. Const. 1970, art. IV, sec. 13), it may be useful to set out, in a preliminary way, the standards under which those arguments would properly be addressed.

The rational-basis test generally has been applied in testing the constitutionality of medical malpractice legislation under guarantees of due process and equal protection. (See Smith, *Battling a Receding Tort Frontier: Constitutional Attacks on Medical Malpractice Laws*, 38 Okla. L. Rev. 195, 202-12 (1985).) Two notable exceptions, however, are found in *Carson v. Maurer* (1980), 120 N.H. 925, 424 A.2d 825, and *Arneson v. Olson* (N.D. 1978), 270 N.W.2d 125. In *Carson* the Supreme Court of New Hampshire held, as a matter of State constitutional law, that the appropriate standard to use in assessing the equal-protection challenges there was "whether the challenged classifications are reasonable and have a fair and substantial relation to the object of the legislation." (120 N.H. 925, 932-33, 424 A.2d 825, 831.) Applying that

intermediate test, the court invalidated a broad range of provisions, including ones that modified the collateral-source rule, provided for the periodic payment of future damages, and set a scale for determining contingent fees. Similarly, in *Arneson* the Supreme Court of North Dakota used an intermediate standard of review—one that required "a 'close correspondence between statutory classification and legislative goals'" (270 N.W.2d 125, 133)—in finding that various medical malpractice provisions violated State constitutional guarantees of equal protection and due process.

We decline to follow *Carson* and *Arneson* in applying to medical malpractice legislation a standard stricter than rationality review. We do not believe that the provisions in question implicate a suspect or quasi-suspect classification, and accordingly the appropriate standard for determining the plaintiff's equal protection challenges under the Illinois and Federal constitutions is whether the legislation bears a rational relationship to a legitimate governmental interest. (*McDonald v. Board of Election Commissioners* (1969), 394 U.S. 802, 809, 22 L. Ed. 2d 739, 745, 89 S. Ct. 1404, 1408; *Illinois Housing Development Authority v. Van Meter* (1980), 82 Ill. 2d 116, 119-20.) This standard applies as well to the additional argument that the provisions violate the State constitutional prohibition against special legislation (*Jenkins v. Wu* (1984), 102 Ill. 2d 468, 477-78; *Anderson v. Wagner* (1979), 79 Ill. 2d 295, 315), for although the guarantee of equal protection and the prohibition against special legislation are not identical, they are "generally judged by the same standard" (*Chicago National League Ball Club, Inc. v. Thompson* (1985), 108 Ill. 2d 357, 368). Similarly, we do not believe that the provisions here burden a fundamental right, and for our purposes here the appropriate inquiry under due process is whether the legislation bears a rational relationship to a legitimate

governmental interest. *Williamson v. Lee Optical of Oklahoma, Inc.* (1955), 348 U.S. 483, 488, 99 L. Ed. 563, 572, 75 S. Ct. 461, 464; *Harris v. Manor Healthcare Corp.* (1986), 111 Ill. 2d 350, 368.

The history of the legislation amply demonstrates that it was enacted in response to what was perceived to be a crisis in the area of medical malpractice. Whether a malpractice crisis existed at all was disputed by the plaintiff in the circuit court, however, and the trial judge expressly found that there was no crisis and that the provisions challenged here were therefore unnecessary. The plaintiff and several *amici* urge those points in this court as well. Their argument is similar to the reasoning employed in *Boucher v. Sayeed* (R.I. 1983), 459 A.2d 87, where the Supreme Court of Rhode Island tested medical malpractice legislation under the rational-basis standard but took judicial notice that no malpractice crisis existed in 1981, when the provisions were enacted. The court therefore held that the provisions violated equal protection, concluding, "Absent a crisis to justify the enactment of such legislation, we can ascertain no satisfactory reason for the separate and unequal treatment that it imposes on medical malpractice litigants." (459 A.2d 87, 93.) The appropriate degree of deference in this regard was explained in *Minnesota v. Clover Leaf Creamery Co.* (1981), 449 U.S. 456, 464, 66 L. Ed. 2d 659, 668-69, 101 S. Ct. 715, 724, where the court said:

> "But States are not required to convince the courts of the correctness of their legislative judgments. Rather, 'those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker.' *Vance v. Bradley* [(1979), 440 U.S. 93, 111, 59 L. Ed. 2d 171, 184-85, 99 S. Ct. 939, 949-50]. [Citations.]
>
> Although parties challenging legislation under the Equal Protection Clause may introduce evidence support-

ing their claim that it is irrational, *United States v. Carolene Products Co.* [(1938), 304 U.S. 144, 153-54, 82 L. Ed. 1234, 1242, 58 S. Ct. 778 784], they cannot prevail so long as 'it is evident from all the considerations presented to [the legislature], and those of which we may take judicial notice, that the question is at least debatable.' [304 U.S. 144, 154, 82 L. Ed. 1234, 1243, 58 S. Ct. 778, 784.] Where there was evidence before the legislature reasonably supporting the classification, litigants may not procure invalidation of the legislation merely by tendering evidence in court that the legislature was mistaken."

It may fairly be said that whether a malpractice crisis existed was a question "at least debatable." Our task, therefore, is limited to determining whether the legislation in question is constitutional, not whether it is wise as well. See *In re J.S.* (1984), 103 Ill. 2d 395, 407.

## I

The plaintiff first challenges the provisions for review panels in cases of healing-art malpractice; these are set out in sections 2—1012 through 2—1020 of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, pars. 2—1012 through 2—1020). The circuit judge found that the panel provisions violated a number of constitutional guarantees.

The legislation in question provides, as a prerequisite to trial in a case for healing-art malpractice, that a panel composed of a circuit judge, a practicing attorney, and a health-care professional must convene and make a determination regarding liability and, if liability is found, damages. Procedures are set out for maintaining rosters of judges, attorneys, and health-care professionals from which the parties select the panel members. (See Ill. Rev. Stat. 1985, ch. 110, pars. 2—1014, 2—1015.) The panel must be formed and must convene and render a decision within certain time limits (see Ill. Rev. Stat.

1985, ch. 110, par. 2—1013), and provision is made for compensating the two nonjudicial members of the panel (see Ill. Rev. Stat. 1985, ch. 110, pars. 2—1019(a), (b)). The parties may unanimously agree to forgo the panels and proceed directly to trial. See Ill. Rev. Stat. 1985, ch. 110, par. 2—1012.

Proceedings before the panel are to be conducted in an adversary manner, and the parties and the panel may call and examine witnesses (see Ill. Rev. Stat. 1985, ch. 110, par. 2—1016(b)). The judicial member of the panel is to preside over the proceedings and is to "determine all questions of law, including matters of evidence" (see Ill. Rev. Stat. 1985, ch. 110, par. 2—1016(a)). Following the hearing, the panel is to render a written decision, with questions of law determined by the judge and questions of fact determined by the panel as a whole. (See Ill. Rev. Stat. 1985, ch. 110, par. 2—1017(a).) At any time the parties may unanimously agree to be bound by the panel's decision, and in that event the decision of the panel is conclusive and judgment may be entered on it. (See Ill. Rev. Stat. 1985, ch. 110, par. 2—1018(a).) Otherwise, if the panel's decision is unanimous, a party must make a written acceptance or rejection of it; failure to reject the decision within 28 days is deemed to be an acceptance of it, and, if the decision is accepted by all the parties, judgment may be entered on it (see Ill. Rev. Stat. 1985, ch. 110, par. 2—1018(b)). If the parties have not agreed to be bound by the panel's decision or have not unanimously accepted it, then the panel judge is to conduct a pretrial conference; following that, the matter is to proceed to trial, as in any other case. The judge who presided over the panel may not preside at trial, and the panel's decision is not admissible at trial. (See Ill. Rev. Stat. 1985, ch. 110, par. 2—1018(d).) A party who rejects a unanimous decision by the review panel and who does not prevail on the issue of liability at trial is liable for

"the costs, reasonable attorneys' fees and expenses" of the prevailing party. Ill. Rev. Stat. 1985, ch. 110, par. 2—1019(c).

In *Wright v. Central Du Page Hospital Association* (1976), 63 Ill. 2d 313, this court invalidated a system of screening panels for medical malpractice cases. The provisions considered in *Wright*, sections 58.2 through 58.10 of the Civil Practice Act (Ill. Rev. Stat. 1975, ch. 110, pars. 58.2 through 58.10), similarly provided for three-member panels, composed of a circuit judge, an attorney, and a physician, to consider evidence and render a decision in actions for medical malpractice. *Wright* found that the panel procedures violated provisions in the Illinois Constitution concerning the source of the judicial power and the jurisdiction of the circuit courts (see Ill. Const. 1970, art. VI, secs. 1, 9). *Wright* also held that because the panel procedures violated those provisions, they were an unconstitutional burden on the right to a jury trial (see Ill. Const. 1970, art. I, sec. 13).

The defendants would distinguish the panel procedures at issue here from those that were found unconstitutional in *Wright*. In *Wright* the judicial member of the panel was to determine all procedural issues, including matters of evidence, and the law of evidence was to be followed unless the panel in its discretion determined otherwise (see Ill. Rev. Stat. 1975, ch. 110, par. 58.6(1)); under the provisions at issue here, the judge on the panel is to determine all questions of law, including matters of evidence, and the law of evidence is to be followed, as determined by the judge (see Ill. Rev. Stat. 1985, ch. 110, par. 2—1016(a)). Also, the provisions considered in *Wright* said simply that the panel was to make its decision according to the applicable substantive law and that the written decision was to contain the panel's conclusions of fact and law (see Ill. Rev. Stat. 1975, ch. 110, par. 58.7(1)); the corresponding provision at is-

sue here provides that the panel is to make its decision according to the substantive law as determined by the judge, and that the panel's written decision is to contain the judge's conclusions of law and the panel's conclusions of fact (see Ill. Rev. Stat. 1985, ch. 110, par. 2—1017(a)).

Because the current provisions make the judicial member of the panel the sole authority over legal issues, the defendants believe that the panel procedures here may be distinguished from those in *Wright*. Although the provisions here are different in several respects from those construed by the court in *Wright*, we do not believe that the current provisions eliminate entirely the problem that concerned the court in *Wright*. The problem described in *Wright*—that the judicial member of the panel was forced to share his authority with the nonjudicial members—did not arise simply because the panel as a whole made legal and factual determinations. Rather, *Wright* was concerned that the nonjudicial members of the panel were given a judicial role, and the court there noted that the nonjudicial members of the panel could make determinations, either legal or factual, contrary to those reached by the judge. For that reason, the court found that the nonjudicial members of the panel were empowered "to exercise a judicial function in violation of sections 1 and 9 of article VI of the Constitution." *Wright v. Central Du Page Hospital Association* (1976), 63 Ill. 2d 313, 322.

A problem similar to that in *Wright* inheres in the panel procedures at issue here. Under these provisions, the role of the judicial member of the panel must take one of two forms. Either he serves on the panel in his judicial capacity but is forced to share, with the two nonjudicial members, his judicial authority to make factual determinations, or he is denied his judicial authority and has no greater authority than the two other panel mem-

bers. Neither alternative is suitable. Notably, statutes calling for the creation of three-member panels of circuit judges to carry out various functions have been held unconstitutional on the grounds that the legislature lacks the authority to create a new court and circuit judges do not act jointly or in a group. (See *In re Contest for Governor* (1983), 93 Ill. 2d 463; *People ex rel. Rice v. Cunningham* (1975), 61 Ill. 2d 353.) If a panel of three circuit judges cannot operate constitutionally, it is difficult to see how a panel consisting of one circuit judge and two laymen can. In essence, the panel procedures at issue here do not adequately distinguish between the judicial and nonjudicial members; their fact-finding functions are still blended, as they were in *Wright*, and the circuit judge's fact-finding and decision-making authority is shared between the judge and the nonjudicial panel members.

For the reasons indicated, we conclude that the procedures for review panels, set out in sections 2—1012 through 2—1020, are unconstitutional. Given this result, we need not consider the plaintiff's remaining arguments against the provisions.

## II

The plaintiff also challenges the provisions allowing the periodic payment of certain damages, set out in sections 2—1701 through 2—1719 of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, pars. 2—1701 through 2—1719). The circuit judge found that they violated a variety of constitutional guarantees.

The provisions, applicable to actions for healing-art malpractice (see Ill. Rev. Stat. 1985, ch. 110, pars. 2—1701, 2—1704), change the traditional rule of lump-sum awards by permitting the payment of large awards of future damages in periodic installments. The provisions do not apply in a particular case, however, unless an effec-

tive election has been made by a party. In general terms, this requires that a party make a timely motion for application of the provisions; the election is effective if the parties agree to have the provisions apply or fail to object to them or, once an objection is made, if it appears that the amount of future damages will exceed $250,000, and, when relevant, certain other conditions are met. See Ill. Rev. Stat. 1985, ch. 110, par. 2—1705.

If the procedures apply in a case, the trier of fact is to make several special findings regarding both past damages and future damages, and must further specify as future damages medical and other health-care costs, other economic losses, and noneconomic loss. Under these provisions, economic loss is defined in terms of pecuniary harm, and noneconomic loss includes loss of consortium and all nonpecuniary harm for which damages are recoverable, including damages for pain and suffering (see Ill. Rev. Stat. 1985, ch. 110, par. 2—1702). Past damages are "damages that have accrued when the damages findings are made" (Ill. Rev. Stat. 1985, ch. 110, par. 2—1703(a)), and future damages are ones that will accrue after that time (Ill. Rev. Stat. 1985, ch. 110, par. 2—1703(b)).

The trier of fact is to compute the future damages without reducing them to present value, and in a jury case, the jury must be instructed to this effect. (See Ill. Rev. Stat. 1985, ch. 110, par. 2—1707.) Only future damages to be paid at the present time require reduction to present value. Under the provisions here, the only damages that may be reduced by the statutory discount factor are economic damages; future noneconomic damages, even though they may be paid at present, are not reduced. Thus, "equivalent lump sum value" is calculated "by applying the discount factor, compounded annually, to those elements of damages for future economic loss, and then adding, without discounting, those elements of

damages for future non-economic loss. The discount factor shall be 6%." (Ill. Rev. Stat. 1985, ch. 110, par. 2—1712.) These computations, we have said, are to be made by the court, and section 2—1708(5) provides:

> "The court shall determine the amount of future damages to be awarded in equivalent lump sum. This amount shall be that part of the equivalent lump sum value of future damages which does not exceed $250,000. *** The amount of future damages awarded in equivalent lump sum shall be added to the total amount of past damages recoverable and this total shall be known as the present award. The periodic award shall consist of the total amount of future damages without reduction to an equivalent lump sum value, reduced in the proportion that the equivalent lump sum value of the amount of future damages included in the lump sum present award bears to the equivalent lump sum value of the total amount of future damages."

Adequate security must be posted by a defendant who is liable for a periodic award. See Ill. Rev. Stat. 1985, ch. 110, par. 2—1711.

The circuit judge found that the provisions denied the right to trial by jury as guaranteed by the Illinois Constitution (see Ill. Const. 1970, art. I, sec. 13) and violated equal protection and due process. The court also held that the provisions constituted special legislation.

It is a well-recognized principle that a litigant does not have an indefeasible interest in the continuation of a particular remedy or mode or form of recovery. (See *Grasse v. Dealer's Transport Co.* (1952), 412 Ill. 179, 190.) Moreover, the only changes effected by the provisions in question here concern the computation and payment of future damages. Many States have enacted provisions allowing for the periodic payment of future damages in medical malpractice cases. (See, *e.g.*, Ala. Code sec. 6—5—486 (1975); Alaska Stat. sec. 09.55.548 (1983); Ark. Stat. Ann. sec. 34—2619 (Supp. 1985); Cal.

Civ. Proc. Code sec. 667.7 (Deering 1983); Del. Code Ann. tit. 18, sec. 6864 (Supp. 1984); Fla. Stat. Ann. sec. 768.51 (West Supp. 1986) (payments from compensation fund); Kan. Stat. Ann. sec. 60—2609 (1983); N.M. Stat. Ann. sec. 41—5—7 (1982) (payments from compensation fund); Or. Rev. Stat. sec. 752.070 (1985) (payments from compensation fund); S.C. Code Ann. sec. 38—59—180 (Law. Co-op. 1985) (payments from compensation fund); Wash. Rev. Code Ann. sec. 4.56.240 (West Supp. 1986) (allowed in any civil action for personal injuries, if plaintiff is totally and permanently disabled); Wis. Stat. secs. 655.015, 655.27(5)(d) (West Supp. 1985) (payments from compensation fund).) Various courts have upheld these provisions against constitutional challenges similar to those made here. See *American Bank & Trust Co. v. Community Hospital* (1984), 36 Cal. 3d 359, 683 P.2d 670, 204 Cal. Rptr. 671; *Florida Patient's Compensation Fund v. Von Stetina* (Fla. App. 1985), 474 So. 2d 783; *State ex rel. Strykowski v. Wilkie* (1978), 81 Wis. 2d 491, 261 N.W.2d 434.

We do not believe that the provisions interfere with the right to trial by jury. The jury is to continue to make all damage computations; the only change in the jury's function from the traditional rule is that the jury is instructed not to reduce the amounts to present value, and the statute provides the discount factor that the trial court must use for that purpose. But this is no greater impediment to the jury-trial right than a statute setting a predetermined interest rate for judgments. Nor is the right to trial by jury diminished by section 2—1719(3), which purports to require the Director of the Department of Insurance to "publish[ ] prior to January 1 of each year the rate of discount per annum set out in subsection (c) of Section 2—1709" (Ill. Rev. Stat. 1985, ch. 110, par. 2—1719(3)). The rate referred to is not that set in section 2—1712, and the duty here actually is nonex-

istent. Section 2—1709(c) says simply, "If the trier of fact has found that different elements of future damages will accrue over different periods of time the court shall direct that amounts to be periodically paid in the future be proportionately divided into the same periods of time." (Ill. Rev. Stat. 1985, ch. 110, par. 2—1709(c).) The uniform act on which these provisions were modeled requires annual adjustments, for inflation, of periodic payments, and it is that figure that the Department of Insurance, in the model act, is to publish annually. (See Model Periodic Payment of Judgments Act, secs. 7, 17, 14 U.L.A. 30, 41 (Supp. 1986).) The drafters did not choose to provide for annual adjustments in the scheme set out here, and therefore section 2—1719(c) may be disregarded.

The plaintiff also finds violations of equal protection and due process in the provisions in question here. Specifically, the plaintiff points to the use of a predetermined discount rate, to provisions pertaining to the disposition of payments upon a recipient's death, and to the forms of security that a tortfeasor may post that will result in his discharge. We observe at the outset that the distinction drawn by the provisions permitting periodic payments in cases of healing-art malpractice, but not in others, does not offend equal protection or constitute special legislation. As explained in the prefatory note to the model act, "[H]alf million and multi-million dollar awards have become so frequent in the last few years that they no longer represent the exceptional case. Such awards have a great impact on the availability and affordability of bodily injury liability insurance. The most acute problems have been experienced in the areas of product liability and medical malpractice, situations that give rise to some of the most serious injury cases." (Model Periodic Payment of Judgments Act, Prefatory Note, 14 U.L.A. 20 (Supp. 1986).) An additional concern

is that large judgments for future damages may be spent before the damages are actually incurred. (See Comment, *Variable Periodic Payments of Damages: An Alternative to Lump Sum Awards,* 64 Iowa L. Rev. 138, 143-45 (1978).) To help remedy that problem, the legislature could have believed that the periodic payment of future damages, the practice under the workers' compensation system (see *Illinois Zinc Co. v. Industrial Com.* (1934), 355 Ill. 253), would be an effective way of preserving large awards for future need. That the provisions at issue here apply only in actions for medical malpractice is not fatal to the scheme,. for "[t]he legislature need not choose between legislating against all evils of the same kind or not legislating at all. Instead it may choose to address itself to what it perceives to be the most acute need. (*Tometz v. Board of Education* (1968), 39 Ill. 2d 593, 601-02; *Rockford Drop Forge Co. v. Pollution Control Board* (1980), 79 Ill. 2d 271, 281.)" (*Chicago National League Ball Club, Inc. v. Thompson* (1985), 108 Ill. 2d 357, 367.) We believe that the provisions are rationally related to a legitimate governmental interest.

With respect to due process, the plaintiff first contends that the discount rate currently set in the provisions, 6%, may be unrealistic and therefore result in overestimations or underestimations of present value. The plaintiff accurately observes that the use of a discount rate lower than prevailing. interest rates may result in an artificially high present value, and, conversely, that the use of a discount rate higher than prevailing interest rates may result in an artificially low present value. Having determined that the legislature's decision to set a discount rate does not interfere with a plaintiff's State constitutional right to a jury trial, we do not consider here the additional, separate question whether an unrealistic or "incorrect" discount rate may result in a denial of due process. The current discount

rate set in the statute is 6%, and apparently that is lower than prevailing interest rates. In this situation, however, a plaintiff could only be benefited; it must be remembered that the discount rate is used only in relation to making an award of future damages in lump sum, which then reduces the periodic award proportionately.

The plaintiff also questions section 2—1713(b), which provides:

> "If, in an action for wrongful death, a judgment for periodic installments provides payments to more than one person entitled to receive benefits for losses that do not terminate under subsection (a) and one or more but fewer than all of them die, the surviving beneficiaries succeed to the shares of the deceased beneficiaries. The surviving beneficiaries are entitled to shares proportionate to their shares in the periodic installments not yet paid, but they are not entitled to receive payments beyond the respective periods specified for them in the judgment." (Ill. Rev. Stat. 1985, ch. 110, par. 2—1713(b).)

A companion provision, section 2—1713(c), says:

> "If, in an action other than one for wrongful death, a judgment for period[ic] installments is entered and a person entitled to receive benefits for losses that do not terminate under subsection (a) under the judgment dies and is survived by one or more qualifying survivors, any periodic installments not yet due at the death must be shared equitably by those survivors." (Ill. Rev. Stat. 1985, ch. 110, par. 2—1713(c).)

The plaintiff believes that the first provision unfairly interferes with the right to dispose of property and that both provisions are vague. The provisions in question, based on those appearing in the model act, do not operate as takings or unduly interfere with one's right to dispose of property. The provisions in question are drawn from the model act. (See Model Periodic Payment of Judgments Act, secs. 11(b), (c), 14 U.L.A. 37 (Supp. 1986).) The comment to the model act explains:

"Subsection (b) deals with the wrongful death case. If a periodic-instalment judgment provides payments to more than one beneficiary of a wrongful death claim and one or more, but fewer than all, of the beneficiaries die, the surviving beneficiaries succeed to the shares of the deceased beneficiaries. The surviving beneficiaries are to divide the deceased beneficiaries' shares proportionately. ***

Subsection (c) deals with cases other than wrongful death in which a person receives a periodic-instalment judgment, but the person subsequently dies. If there are qualifying survivors, any periodic instalments representing economic loss not yet due at the death must be shared equitably between the survivors." (14 U.L.A. 37—38 (Supp. 1986).)

Thus, section 2—1713(b) relates back to the time of the wrongful death and distributes the deceased beneficiary's future installments among the group of other beneficiaries. We do not believe that this restriction is unconstitutional. Limiting payments of future damages to the beneficiaries of the wrongful death in effect preserves the appropriate group of persons to whom those payments properly belong, and we find no constitutional infirmity in that method of distribution. Finally, if the provisions are vague and their application uncertain, then they will have to be construed like any other statute that may be complex in its application. Civil statutes such as these, which do not purport to regulate any first amendment activity, generally are not invalidated because they are "vague."

The plaintiff also objects to the forms of security that may be required (see Ill. Rev. Stat. 1985, ch. 110, par. 2—1710) and to the discharge of tortfeasors upon the posting of adequate security (see Ill. Rev. Stat. 1985, ch. 110, par. 2—1718). These fears are speculative. Because the future is uncertain, the problems that the plaintiff complains of are inherent in any system for periodic pay-

ments. The provisions here contain certain safeguards designed to reduce the risk of insolvency. Different forms of security may be required (see Ill. Rev. Stat. 1985, ch. 110, par. 2—1710), and in an appropriate case, the circuit court may require the payment of a lump-sum judgment. (See Ill. Rev. Stat. 1985, ch. 110, par. 2— 1708(10).) We do not believe that the plaintiff's objections to the provisions rise to the level of a constitutional infirmity.

## III

The plaintiff also challenges the constitutionality of section 2—1205 of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2—1205), which modifies the collateral-source rule. Traditionally, sums received from collateral sources are not used to reduce a judgment against a tortfeasor, but section 2—1205 provides that they may be considered in some instances. The statute is limited to negligence actions against hospitals and physicians. Under section 2—1205, which was enacted in 1976 (see Ill. Rev. Stat. 1977, ch. 110, par. 68.4), a judgment may be reduced by up to one half for benefits received from collateral sources. Originally the provision allowed for the deduction of 50% of the benefits received for lost wages, from private or governmental disability programs, or for medical, hospital, nursing, or caretaking charges. Public Act 84—7 increased the allowable deduction for benefits payable for medical, hospital, nursing, or caretaking charges to 100%. Public Act 84—7 also added language prohibiting reductions "for charges paid for medical expenses which were directly attributable to the adjudged negligent acts or omissions of the defendants found liable," and it now provides that the judgment is to be increased by the amounts paid in the two preceding years for premiums or other costs associated with obtaining the collateral benefits. The circuit judge

found that section 2–1205 violated equal protection and due process, that it constituted special legislation, and that it conflicted with a Federal law.

A large number of other States have modified or abrogated the collateral-source rule in medical malpractice cases, allowing recoveries to be reduced by amounts received from public or private sources. (See, *e.g.*, Alaska Stat. sec. 09.55.548 (1983); Ariz. Rev. Stat. Ann. sec. 12–565 (Supp. 1985); Cal. Civil Code sec. 3333.1 (Deering 1984); Del. Code Ann. tit. 18, sec. 6862 (Supp. 1984); Fla. Stat. Ann. sec. 768.50 (West 1986); Iowa Code Ann. sec. 147.136 (Supp. 1985); Neb. Rev. Stat. sec. 44–2819 (1984); N.Y. Civ. Prac. Law sec. 4545(a) (McKinney Supp. 1986); S.D. Codified Laws Ann. sec. 21–3–12 (1979); Tenn. Code Ann. sec. 29–26–119 (1980); Utah Code Ann. sec. 78–14–4.5 (Supp. 1985); Wash. Rev. Code sec. 7.70.080 (West Supp. 1986).) Generally, too, these provisions have been found to be constitutional on equal protection and due process grounds. (See, *e.g.*, *Eastin v. Broomfield* (1977), 116 Ariz. 576, 585, 570 P.2d 744, 753; *Fein v. Permanente Medical Group* (1985), 38 Cal. 3d 137, 166-67, 695 P.2d 665, 685-86, 211 Cal. Rptr. 368, 388-89; *Pinillos v. Cedars of Lebanon Hospital Corp.* (Fla. App. 1981), 403 So. 2d 365, 367-68; *Rudolph v. Iowa Methodist Medical Center* (Iowa 1980), 293 N.W.2d 550, 557-59.) Section 2–1205 eliminates certain duplicative recoveries and therefore bears a rational relationship to the legitimate governmental interest of reducing the costs of malpractice actions. For that reason, then, we find no violation of equal protection, nor do we believe that the provision is invalid as special legislation. That the provision here allows for the reimbursement of only two years' payments for the collateral benefits affected by it does not, as the plaintiff contends, create an unfair distinction among claimants. Moreover, the modification made here to the collateral-

source rule does not, we believe, offend due process or result in the impairment of contracts. In eliminating some part of the duplication inherent in recovering sums from both the tortfeasor and a collateral source, the provision does not diminish the amount received from the collateral source but instead reduces the amount of the recovery from the tortfeasor. It is well recognized that the collateral-source rule "is of common law origin and can be changed by statute." Restatement (Second) of Torts sec. 920A, comment *d* (1979).

The plaintiff also contends that the deduction allowed by section 2—1205 conflicts with a Federal statute, section 407(a) of the Social Security Act (42 U.S.C. sec. 407a (Supp. II 1984)), which says, "The right of any person to any future payment under this subchapter shall not be transferable or assignable, at law or in equity, and none of the moneys paid or payable or rights existing under this subchapter shall be subject to execution, levy, attachment, garnishment, or other legal process ***." The plaintiff concludes, under the supremacy clause of the Federal Constitution (U.S. Const., art. VI, cl. 2), that the Illinois law must fall.

We find no conflict between the two provisions. If, under a setoff system, suit were filed to attach social security benefits, the Federal provision would be violated. (*Philpott v. Essex County Welfare Board* (1973), 409 U.S. 413, 34 L. Ed. 2d 608, 93 S. Ct. 590.) Section 2—1205 does not do that, however. In *Raskin v. Moran* (7th Cir. 1982), 684 F.2d 472, the court rejected the contention that a Wisconsin provision requiring the setoff from salaries of "reserve" or retirement-aged judges of amounts equal to their social security benefits violated section 407(a) of the Social Security Act. The court explained:

"We believe that plaintiffs' reliance on section [407] of the Act, 42 U.S.C. section 407 (1976), is misplaced. It is

evident that section [407], on its face, protects social security benefits against direct attachment, garnishment, assignment, or levy. [Citations.] Our research has disclosed no case where a court has either upheld or invalidated under section [407] a salary setoff scheme similar to the one at issue here." (684 F.2d 472, 476 n.7.) We do not believe that section 407(a) of the Social Security Act is violated by the modification made here to the collateral-source rule, and accordingly we find no conflict between that provision and the State provision at issue here.

## IV

The plaintiff also challenges the provision prohibiting awards of punitive damages in actions for healing art or legal malpractice. Section 2—1115 of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2—1115) provides:

"In all cases, whether in tort, contract or otherwise, in which the plaintiff seeks damages by reason of legal, medical, hospital, or other healing art malpractice, no punitive, exemplary, vindictive or aggravated damages shall be allowed."

The circuit judge found that section 2—1115 violated the Federal and State guarantees of due process and equal protection and that it constituted special legislation. The court also found that section 2—1115 violated the provision in the Illinois Constitution requiring that bills be confined to one subject (see Ill. Const. 1970, art. IV, sec. 8(d)).

Notably, other statutes prohibiting the recovery of punitive damages in various types of actions previously have been upheld by this court. (See *Siegall v. Solomon* (1960), 19 Ill. 2d 145 (actions for alienation of affections); *Smith v. Hill* (1958), 12 Ill. 2d 588 (actions for breach of promise to marry).) We do not believe that the

prohibition here offends equal protection. That question was considered in *In re Air Crash Disaster* (7th Cir. 1981), 644 F.2d 594, involving claims for punitive damages in wrongful death actions, and the court there rejected the argument that the denial of punitive damages in wrongful death actions would violate the equal protection clause of the Federal Constitution. Expressing what it had found to be the unanimous view on the subject, the court held that the prohibitions, including that of this State, were rationally related to a legitimate governmental interest and therefore were constitutional. In reaching that conclusion the court noted that more severe limitations had been upheld and that the purpose of barring punitive damages in a particular context—to avoid excessive liability—was a legitimate legislative goal served by the chosen means. A similar result must obtain here. That this court previously has invalidated, as special legislation, limits on recovery of compensatory damages in medical malpractice actions (see *Wright v. Central Du Page Hospital Association* (1976), 63 Ill. 2d 313, 329-30), does not require that punitive damages be available in every case. The two are readily distinguishable; punitive damages, as their name suggests, are intended to punish rather than compensate.

Moreover, that in Illinois one may not insure against awards of punitive damages (see *Beaver v. Country Mutual Insurance Co.* (1981) 95 Ill. App. 3d 1122) does not render the provision irrational in the context in which it was enacted. The purpose of the legislation here was broad enough, we believe, to extend beyond problems that must be peculiar to insurable damages. The elimination of awards for punitive damages in actions for medical malpractice serves the legislative goals of reducing damages generally against the medical profession. For these reasons, we conclude that the provision does not violate equal protection or due process or constitute spe-

cial legislation.

The plaintiff also argues that section 2—1115 violates the single-subject requirement contained in the Illinois Constitution (Ill. Const. 1970, art. IV, sec. 8(d)), which says, "Bills, except bills for appropriations and for the codification, revision or rearrangement of laws, shall be confined to one subject." Because section 2—1115 bars awards of punitive damages not only in actions for healing-art malpractice but also in actions for legal malpractice, the plaintiff believes that the provision embraces more than one subject.

The single-subject clause prohibits the inclusion of "discordant" provisions in the same legislation. (See *People ex rel. Ogilvie v. Lewis* (1971), 49 Ill. 2d 476, 487-88.) In *People ex rel. Carey v. Board of Education* (1973), 55 Ill. 2d 533, the court considered the argument that a single-subject violation was present in an act that amended the School Code by containing provisions that changed the fiscal year for the Chicago board of education and also establishing parental or truant schools in that system. The court found no violation of the single-subject clause contained in the current constitution, explaining:

> "As we stated in *Sangamon County Fair and Agricultural Ass'n v. Stanard* (1956), 9 Ill. 2d 267, 272-3: 'When the title of the act amended is set forth in the title of the amendatory act, as was here done, any provision which might have been inserted in the original act may be incorporated in the amendatory act.' Provisions concerning 'parental schools' were included in the School Code before its amendment (see Ill. Rev. Stat. 1971, ch. 122, par. 34—117) and they did not become 'discordant' or 'incongruous' because they were included in this amendatory act. *Cf. People ex rel. Gutknecht v. City of Chicago* (1953), 414 Ill. 600." (55 Ill. 2d 533, 536-37.)

The comparable provision in the previous Illinois Constitution said, "No act hereafter passed shall embrace more

than one subject, and that shall be expressed in the title." (Ill. Const. 1870, art. IV, sec. 13.) Unlike the provision in the 1870 Constitution, the current provision does not contain the requirement that the subject of an act be expressed in its title. The force of those earlier decisions remains, however, for their underlying assumption was that the subject to be expressed in the title of the act was indeed a single subject. Because the Code of Civil Procedure could contain separate prohibitions of awards of punitive damages in medical malpractice actions and legal malpractice actions, their inclusion together in one provision does not offend the single-subject requirement. See also *Schlenz v. Castle* (1981), 84 Ill. 2d 196, 209-11 (applying *Carey* to amendments to the Revenue Act of 1939).

## V

The remaining provision challenged by the plaintiff here is section 2—1114 of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2—1114), which establishes a sliding scale of the allowable fees that an attorney may charge in representing a plaintiff in a medical malpractice action. The provision defines a contingent fee as "any fee arrangement under which the compensation is to be determined in whole or in part on the result obtained" (Ill. Rev. Stat. 1985, ch. 110, par. 2—1114(d)) and provides that it may not exceed one-third of the first $150,000 recovered, one fourth of the next $850,000 recovered, and one fifth of any amount over $1 million (Ill. Rev. Stat. 1985, ch. 110, par. 2—1114(a)). The statute also provides that in "determining any lump sum contingent fee, any future damages recoverable by the plaintiff in periodic installments shall be reduced to a lump sum value." (Ill. Rev. Stat. 1985, ch. 110, par. 2—1114(b).) The statute also provides: "The court may review contingent fee agreements for fairness. In special circum-

stances, where an attorney performs extraordinary services involving more than usual participation in time and effort the attorney may apply to the court for approval of additional compensation." Ill. Rev. Stat. 1985, ch. 110, par. 2—1114(c).

The circuit judge found that the provision violates the separation-of-powers clause by invading the authority of the judicial branch to oversee the activities of attorneys, that it violated due process, that it may deny plaintiffs access to the courts, and that it constituted special legislation and violated principles of equal protection.

Other States have enacted statutes regulating or controlling the contingent fees that attorneys may charge in representing parties in medical malpractice cases. Many of those provisions, like the one in question here, contain specific limits on the percentage rates that may be used in computing the fee. (See, *e.g.*, Cal. Bus. & Prof. Code sec. 6146 (Deering Supp. 1986) (40% of first $50,000, 33⅓% of next $50,000, 25% of next $100,000, and 10% of any amount over $200,000); Del. Code Ann. tit. 18, sec. 6865 (Supp. 1984) (35% of first $100,000, 25% of next $100,000, and 10% of any amount over $200,000); Ind. Code Ann. sec. 16—9.5—5—1 (Burns 1983) (15% of amounts awarded from compensation fund); N.Y. Jud. Law sec. 474—a (McKinney Supp. 1986) (30% of first $250,000, 25% of next $250,000, 20% of next $500,000, 15% of next $250,000, and 10% of any amount over $1,250,000); Or. Rev. Stat. sec. 752.150 (1985) (33⅓% of recovery); Tenn. Code Ann. sec. 29—26—120 (1980) (33⅓% of recovery); Utah Code Ann. sec. 78—14—7.5 (Supp. 1985) (33⅓% of recovery).) In other States, however, the limiting provisions are less precise and require only that a court set or approve what is a reasonable fee; these provisions frequently set out relevant criteria, such as the result obtained, the time expended, and counsel's expertise, to use in evaluating or determining

the fee. (See, *e.g.*, Ariz. Rev. Stat. Ann. sec. 12—568 (1982); Hawaii Rev. Stat. sec. 671—2 (Supp. 1984); Iowa Code Ann. sec. 147.138 (West Supp. 1985); Kan. Stat. Ann. sec. 7—121b (1982); Neb. Rev. Stat. sec. 44—2834 (1984); Wash. Rev. Code sec. 7.70.070 (West Supp. 1986).) Wisconsin excludes certain amounts from the computation of the contingent. (Wis. Stat. Ann. sec. 655.013 (West 1980) (contingent fee may not reflect amount previously paid for medical expenses by the health-care provider, or future medical expenses greater than $25,000).) In one State, New Jersey, maximum percentage rates for contingent fees are set by court rule. N.J. Ct. R. 1:21—7 (West 1986) (33⅓% of first $250,000, 25% of next $250,000, and 20% of next $500,000; for amount over $1 million, application for fee to be made to court).

We first consider the plaintiff's argument that the limits placed on fees by section 2—1114 violate the separation-of-powers clause of the Illinois Constitution (Ill. Const. 1970, art. II, sec. 1). The plaintiff contends that the provision is an unconstitutional attempt by the legislature to regulate the legal profession (see *In re Day* (1899), 181 Ill. 73) and trenches on the established authority of the courts to supervise contingent-fee arrangements (see *Pocius v. Halvorsen* (1963), 30 Ill. 2d 73). We do not believe that section 2—1114 has the effect suggested by the plaintiff. By providing maximum percentage rates that normally may be charged while allowing the circuit court to approve a larger fee in an appropriate case, the provision does not purport to limit the scope of a court's authority over those matters. Whether the provision would fail if it did not contain the allowance for larger fees is not before us.

Relevant, too, are the large number of other State and Federal statutes limiting the amounts of fees that lawyers may charge in handling certain claims or

actions. (See, *e.g.*, Ill. Rev. Stat. 1985, ch. 37, par. 439.24—6.1 (Court of Claims); Ill. Rev. Stat. 1985, ch. 48, par. 138.16a (Workers' Compensation Act); 28 U.S.C. sec. 2678 (1982) (Federal Tort Claims Act); 38 U.S.C. sec. 3404 (1982) (Veterans' Benefits Act); 42 U.S.C. sec. 406(b)(1) (1982) (Social Security Act).) Moreover, provisions like these limiting fees in actions against the government are constitutional. (See *Calhoun v. Massie* (1920), 253 U.S. 170, 64 L. Ed. 843, 40 S. Ct. 474.) The plaintiff argues, however, that those provisions are distinguishable because in providing for the particular statutory remedies the legislature properly could limit the fees that could be charged in pursuing claims under those provisions. The actions involved here, the plaintiff observes, remain common law remedies.

The difference between common law and statutory rights, remedies, or causes of action does not support the distinction that the plaintiff would draw here. The legal profession is as subject to regulation and interference by the limits contained in the statutes set out above as it is by the provision in question here. In either case, the relationship affected is that between the attorney and his client, and that does not vary with the source of the remedy being pursued.

Nor do we believe that section 2—1114 violates due process or will work to limit litigants access to the courts (see Ill. Const. 1970, art. I, sec. 12). In *Walters v. National Association of Radiation Survivors* (1985), 473 U.S. 305, 87 L. Ed. 2d 220, 105 S. Ct. 3180, the United States Supreme Court held that the $10 limit on fees provided in section 3404 of the Veterans' Benefits Act did not result in a denial of due process under the fifth amendment or restrict claimants' access to the courts under the first amendment (U.S. Const. amends. I, V). The court noted the informality and relative simplicity of claims brought under that act. Although the actions at

issue here are many times more complex, the restrictions imposed by the statute are not nearly as severe. And as we have said, the statute contains the special provision allowing awards greater than the normal limits when circumstances warrant (see Ill. Rev. Stat. 1985, ch. 110, par. 2—1114(c)).

The plaintiff also argues that section 2—1114 violates equal protection and constitutes special legislation because in other cases litigants are not limited in the amount of the fee that they may pay their attorneys. Here, again, we believe that the provision is rationally related to a legitimate governmental interest. The goals of the legislation, we have said, were to reduce the burdens existing in the health professions as a result of the perceived malpractice crisis. The legislature may have reasonably believed that the limits on fees would expedite the resolution of disputes, act as a disincentive for filing frivolous suits, and preserve to a plaintiff a greater part of his recovery, and in those ways help reduce the malpractice crisis. (See *Roa v. Lodi Medical Group, Inc.* (1985), 37 Cal. 3d 920, 931, 695 P.2d 164, 170-71, 211 Cal. Rptr. 77, 83-84.) The plaintiff believes that a more effective means of deterring frivolous actions is found in section 2—622 of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2—622), which was added to the Code by Public Act 84—7. That provision requires that an attorney filing a malpractice action submit an affidavit indicating that he has consulted with a health-care professional who has determined that the action is meritorious. In attempting to remedy a perceived ill, the legislature is not limited to choosing the single, most effective remedy against the problem but rather may decide to attack it along several fronts simultaneously. Moreover, as we have observed, the limits on fees serve other purposes as well. We conclude, therefore, that the limits on fees are rationally related to the legislation's purpose

and therefore pass constitutional muster.

## VI

For the reasons indicated, we hold that the provisions for review panels, sections 2—1012 through 2—1020, are unconstitutional, and that the other provisions challenged by the plaintiff here—sections 2—1701 through 2—1719, 2—1205, 2—1115, and 2—1114, concerning, respectively, the periodic payments of future damages, the collateral-source rule, punitive damages, and attorney fees—are constitutional. Accordingly, the judgment of the circuit court is affirmed in part and reversed in part.

*Affirmed in part*
*and reversed in part.*

JUSTICE SIMON took no part in the consideration or decision of this case.

JUSTICE RYAN, concurring in part and dissenting in part:

I concur with the majority opinion, except that I believe the fact that the judge member of the review panel shares the fact-finding function with the two nonjudge members does not render the panel provisions of the act unconstitutional. There are, however, other provisions relating to the review panel which pose serious constitutional questions.

The provisions for review panels in the present act, sections 2—1012 through 2—1020 of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, pars. 2—1012 through 2—1020), in my opinion, do not contain the same constitutional problems as did similar provisions in "An Act to revise the law in relation to medical practice" (Public Act 79—960, approved Sept. 12, 1975, eff. Nov. 11, 1975). Section 1 of that act added sections 58.2 through 58.10 to the Civil Practice Act (Ill. Rev. Stat.

1975, ch. 110, pars. 58.2 through 58.10). These sections provided for review panels in medical malpractice actions on which the nonjudge members of the panel were vested with authority equal to that of the judge member of the panel in determining and applying substantive law. This court held that these provisions empowered the nonjudge members of the panel to exercise judicial functions in violation of sections 1 and 9 of article VI of the Illinois Constitution of 1970. *Wright v. Central Du Page Hospital Association* (1976), 63 Ill. 2d 313, 322.

In the present act, the fact that the nonjudge members of the review panel share the fact-finding function with the judge member does not, in my opinion, vest the judicial powers in nonjudicial personnel. In fact, the provisions of our present act clearly separate the judicial and nonjudicial functions of the panel. In jury trials the fact-finding function has long been vested completely in nonjudicial personnel. I therefore do not view the participation of the nonjudicial members of the panel in the fact-finding process as invading the province of the judiciary. In *Wright*, this court stated, "[W]e do not imply that a valid pretrial panel procedure cannot be devised." (*Wright v. Central Du Page Hospital Association* (1976), 63 Ill. 2d 313, 324.) Also, in *Anderson v. Wagner* (1979), 79 Ill. 2d 295, 304, this court restated that observation of *Wright*, and said that in *Wright* we did not hold that all statutory provisions creating panels for the review of malpractice claims were unconstitutional. I believe that a valid panel of three individuals, including one judge, can be created as long as the judicial functions are clearly separated from the nonjudicial functions and are vested in the judicial member of the panel. I am of the opinion that this has been clearly accomplished by the present act. See Comment, *Illinois' Medical Malpractice Review Panel Provision: A Constitutional Analysis*, 17 Loy. U.

Chi. L.J. 275, 286 (1986).

In *Eastin v. Broomfield* (1977), 116 Ariz. 576, 570 P.2d 744, the Supreme Court of Arizona distinguished its statute from our 1975 medical malpractice act and declined to follow this court's decision in *Wright*. The Arizona court in *Eastin* upheld the provisions of the Arizona statute which provided that a judge, a lawyer and a health-care provider sit as a medical malpractice review panel. The court found that the operation of such a panel would not invade the judicial function of the court.

Thus I believe that a medical review panel which includes one judicial member may constitutionally operate in the manner provided in our act, and I disagree with the conclusion of the majority opinion to the contrary. However, I also believe that the provision of section 2—1019(c) of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2—1019(c)) which provides for the assessment of costs and attorney fees is constitutionally defective. That section states that when a party who has rejected a determination of the review panel does not prevail on the issue of liability at trial, "the trial court on motion of any prevailing party shall summarily tax to the rejecting party the costs, reasonable attorneys' fees and expenses of the prevailing party incurred in connection with the review panel and the trial." (Ill. Rev. Stat. 1985, ch. 110, par. 2—1019(c)). There is no limit placed on the costs and attorney fees that may be assessed. Considering that these costs and attorney fees include those incurred in both the proceeding before the panel and at trial, the amount of the potential assessment may easily be so large as to dissuade a party from proceeding to trial with a meritorious claim. (See Comment, *Illinois' Medical Malpractice Review Panel Provision: A Constitutional Analysis*, 17 Loy. U. Chi. L.J. 275, 291-94 (1986).) This provision places too heavy a burden on the right to jury trial to pass constitutional muster.

Another troublesome provision of our act is found in section 2—1018(d) of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2—1018(d)), which provides that "any judge who served on a review panel in the case may not preside at the trial." Such a restriction on the judge may appear to be logical and justified. However, a recent decision of this court casts doubt on the validity of such a legislative enactment as being a violation of powers expressly conferred upon the court by our constitution. See *People v. Joseph* (1986), 113 Ill. 2d 36.

For the above reasons, I would uphold the medical review panel but would invalidate the other objectionable provisions discussed, which I consider to be severable.