ROBERT B. EARNHART *et al.*, d/b/a Earnie's Finer Food and Spirits, Plaintiffs-Appellants, v. DIRECTOR OF THE DEPARTMENT OF REVENUE *et al.*, Defendants-Appellees.

Fifth District   No. 5—88—0267

Opinion filed December 6, 1989.

Thomas W. Burkart, of Hamel, for appellants.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Karen Michels Caille, Assistant Attorney General, of Chicago, of counsel), for appellees.

JUSTICE HOWERTON delivered the opinion of the court:

Plaintiffs, Robert and Debra Earnhart, d/b/a Earnie's Finer Food and Spirits, raised money for the Multiple Sclerosis Society by running horseshoe games, road rallies, golf matches, concerts with door prizes and Las Vegas nights. Not having a license as required by the Charitable Games Act (Ill. Rev. Stat. 1987, ch. 120, par. 121 *et seq.*), they were assessed a civil penalty of $250 by the Illinois Department of Revenue.

Plaintiffs sued the Director of the Department and the manager of the Department's Charitable Games Division in Madison County for declaratory and injunctive relief, challenging the constitutionality of the Charitable Games Act (the Act).

The circuit court upheld the constitutionality of the Act, and the plaintiffs appeal. We affirm.

While plaintiffs' case was pending in the circuit court, plaintiffs also sought administrative review of the decision to assess them the civil penalty made by the Department of Revenue. Therefore, at the outset, we address whether plaintiffs can seek judicial relief without first exhausting their administrative remedies.

■ Although as a general rule one must exhaust administrative remedies before obtaining judicial review, an exception applies when a party challenges the constitutionality of a statute on its face. *County of Kane v. Carlson* (1987), 116 Ill. 2d 186, 199, 507 N.E.2d 482, 486; *Walker v. State Board of Elections* (1976), 65 Ill. 2d 543, 552, 359 N.E.2d 113, 117.

We now address plaintiffs' constitutional claims.

I

Plaintiffs claim that the Charitable Games Act is not specific as to what is a "charitable game." In consequence of that infirmity, plaintiffs make three constitutional attacks upon the Act: (1) the Act is unconstitutionally vague, denying them due process; (2) the Act is overbroad, reaching beyond gambling to other games, and therefore, denies them due process; and (3) the Act is an unlawful delegation of legislative authority, since it does not specify the games to which it applies, thereby allowing the Department of Revenue to determine

what games are to be licensed under the Act. Each of these arguments necessarily turns on whether the Act is specific as to the games to which it applies.

■ The Act lists the only games which may be conducted at a charitable games event; they are: (a) roulette; (b) black-jack; (c) poker; (d) pull-tabs; (e) craps; (f) bang; (g) beat the dealer; (h) big six; (i) gin rummy; (j) five-card-stud poker; (k) chuck-a-luck; (l) keno; (m) hold-em-poker; and (n) merchandise wheel. (Ill. Rev. Stat. 1987, ch. 120, par. 1128 (15); 86 Ill. Adm. Code 435.160 (Supp. 1987).) Furthermore, "charitable games" is defined in the Illinois Administrative Code as "[t]he fourteen games of chance involving cards, dice, wheels, random selection of numbers, and gambling tickets enumerated in section 435.160 *** which may be conducted at charitable games events." 86 Ill. Adm. Code 435.110 (Supp. 1987).

■ The express purpose of the Act is to permit not-for-profit organizations to conduct charitable games as well as to reaffirm that gambling in Illinois, for noncharitable purposes, is not to be allowed. (Ill. Rev. Stat. 1987, ch. 120, par. 1121.1(c).) The Act further provides that "[a]ny person who conducts or knowingly participates in an unlicensed charitable game commits the offense of gambling in violation of section 28—1 of the Criminal Code of 1961, as amended." Ill. Rev. Stat. 1987, ch. 120, par. 1132.

The intent of the legislature is clear. Only the 14 games listed in the Act can be played at a charitable games event, and then only if licensed under the Act. A "charitable game" is licensed gambling.

The intent of the legislature having been found, and the statute examined, we address each of plaintiffs' constitutional attacks upon the Act.

■ We first note, however, that there is a strong presumption of the constitutionality of a statute, and the burden of demonstrating its invalidity is on the challenging party. *Bernier v. Burris* (1986), 113 Ill. 2d 219, 227, 497 N.E.2d 763, 767; *Meeker v. Tulis* (1985), 134 Ill. App. 3d 1093, 1096, 481 N.E.2d 810, 813.

We find that plaintiffs have not met their burden.

A

■ Plaintiffs first contend that the Charitable Games Act is unconstitutionally vague, denying them due process because the term "charitable game" is not defined in the Act, and therefore, persons of ordinary intelligence must necessarily guess at the Act's meaning and application. Plaintiffs heavily rely on *Spinelli v. Immanuel Lutheran Evangelical Congregation, Inc.* (1987), 118 Ill. 2d 389, 402, 494

N.E.2d 196, 201, citing *Mayhew v. Nelson* (1931), 346 Ill. 381, 387, 178 N.E. 921, 923, wherein the court said:

> "A law must be complete in all its terms and conditions *** so that every person may know, by reading the law, what his rights are and how it will operate when put into execution. [Citations.] *** A legislative act which is so vague *** or which is so incomplete *** that it cannot be executed, will be declared to be inoperative and void."

On the other hand, a statute does not violate due process on the grounds of vagueness if the duty or obligation imposed is prescribed in terms definite enough to serve as guide to those who must comply with the statute. *Fagiano v. Police Board* (1983), 98 Ill. 2d 277, 282, 456 N.E.2d 27, 29.

■ We believe that persons of ordinary intelligence upon reading the Act would know from the Act that: (1) only those games listed above could be played at a charitable games event, (2) the event would have to be licensed under the Act, and (3) a failure to obtain a license or the playing of a game not listed even with a license would be gambling in violation of the Criminal Code. We hold the Act constitutional, able to withstand this attack.

B

Plaintiffs next contend the Act is unconstitutional because it is overbroad. They attack the Act, claiming the term "charitable game" can include more than gambling.

■ Our courts have ruled that a statute is overbroad if it can be reasonably interpreted to prohibit conduct which is constitutionally protected. *People v. Klick* (1977), 66 Ill. 2d 269, 273, 362 N.E.2d 329, 331; *Grayned v. City of Rockford* (1972), 408 U.S. 104, 114-15, 33 L. Ed. 2d 222, 231, 92 S. Ct. 2294, 2302.

■ This attack likewise fails in view of the clarity and specificity of the games covered by the Act. The Act only allows specified games to be played and requires a license for the event. Failure to obtain a license or playing a nonspecified game results in illegal gambling. Each game listed, furthermore, is a rather well-known game of chance, which we, although perhaps not well acquainted with any, nevertheless have no compunction in so noting judicially. The Act, therefore, is not overbroad; it does not reach beyond its purpose.

C

Plaintiffs next attack the Act as an unlawful delegation of legislative authority, claiming that because it does not specify the games

to which it applies, it delegates unlawfully power to the Department of Revenue to determine what games are covered by the Act.

As a general rule, legislative delegation of authority to an administrative agency must provide sufficient identification of the following: (1) the persons and activity subject to the regulation; (2) the harm sought to be prevented; and (3) the means intended to be available to the agency to prevent the harm. (*Stofer v. Motor Vehicle Casualty Co.* (1977), 68 Ill. 2d 361, 372, 369 N.E.2d 875, 879.) Plaintiffs attack this Act only as to the first of these three requirements. Plaintiffs' contention fails, because, as seen above, the Act limits its application to specific games.

## II

Plaintiffs' last constitutional attack upon the Act claims a violation of the equal protection clause of the fourteenth amendment of the United States Constitution. (U.S. Const., amend. XIV.) They contend that they are denied equal protection because the Act allows a license to not-for-profit organizations but denies a license to enterprises run for profit.

In making their denial of equal protection claim, plaintiffs make two arguments. First, plaintiffs claim that solicitation of contributions is speech, protected under the first amendment of the United States Constitution (*Heffron v. International Society for Krishna Consciousness, Inc.* (1981), 452 U.S. 640, 646, 69 L. Ed. 2d 298, 305, 101 S. Ct. 2559, 2563; *Village of Schaumburg v. Citizens for a Better Environment* (1980), 444 U.S. 620, 631, 63 L. Ed. 2d 73, 82, 100 S. Ct. 826, 833), and therefore, the Act infringes upon a fundamental right, creating a suspect classification, requiring this court to scrutinize strictly the Charitable Games Act. Second, plaintiffs argue, in the alternative, that if the classification is not suspect, nevertheless, the Act violates equal protection as guaranteed by the fourteenth amendment to the United States Constitution, because the classification created by the Charitable Games Act is arbitrary and not rationally related to a legitimate governmental interest. *Massachusetts Board of Retirement v. Murgia* (1976), 427 U.S. 307, 312-13, 49 L. Ed. 2d 520, 524, 96 S. Ct. 2562, 2566-67; *Eisenstadt v. Baird* (1972), 405 U.S. 438, 446, 31 L. Ed. 2d 349, 358, 92 S. Ct. 1029, 1035.

## A

We address plaintiffs' first argument that the Act infringes upon their first amendment right of speech, and therefore, the classifications affecting them must be subject to strict scrutiny under the

equal protection clause.

■■ *Cantwell v. Connecticut* (1940), 310 U.S. 296, 84 L. Ed. 2d 1213, 60 S. Ct. 900, appears to be the seminal case dealing with the legitimacy of State regulation of solicitation of charitable contributors. *Cantwell* was decided upon the free exercise clause; nevertheless, *Cantwell* has been understood to "have implied that soliciting funds involves interests protected by the First Amendment's guarantee of freedom of speech." *Schaumburg v. Citizens for a Better Environment* (1980), 444 U.S. 620, 629, 63 L. Ed. 2d 73, 82, 100 S. Ct. 826, 832, citing *Virginia State Pharmacy Board v. Virginia Citizens Consumer Council, Inc.* (1976), 425 U.S. 748, 761, 48 L. Ed. 2d 346, 358, 96 S. Ct. 1817, 1825; *Bates v. State Bar of Arizona* (1977), 433 U.S. 350, 363, 53 L. Ed. 2d 810, 823, 97 S. Ct. 2691, 2698.

*Cantwell, Schaumburg,* and *Bates* involved solicitation door to door or on the streets, or involved the dissemination of information by the charitable organizations themselves. No case law cited by plaintiffs indicates that a right of freedom of expression exists with regard to gambling. Expressing religious or political beliefs, or soliciting contributions to aid such beliefs, is considerably different from conducting Las Vegas Nights in a bar. Furthermore, all of these cases involved

> "a variety of speech interests—communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes ***. Soliciting financial support is undoubtedly subject to reasonable regulation but the latter must be undertaken with due regard for the reality that solicitation is characteristically intertwined with informative and perhaps persuasive speech ***." *Schaumburg,* 444 U.S. at 632, 63 L. Ed. 2d at 84, 100 S. Ct. at 833-34.

■■ An examination of the record in this case does not reveal State regulation of speech. Nowhere is it claimed that the State required a license to disseminate information about multiple sclerosis; nowhere is it claimed the State required a license before being able to advocate raising money to treat multiple sclerosis; nowhere is it claimed that the State required a license before allowing plaintiffs to advertise that they would hold a Las Vegas night in their bar; nowhere is it claimed that the State required a license before plaintiffs could inform people that the event would raise money to fight multiple sclerosis; nowhere is it claimed that the State required a license before plaintiffs could persuade others to come and participate; and nowhere is it claimed that the State licensed plaintiffs' speech inside the bar during the event itself. The activity licensed was not speech;

it was gambling. Therefore, no fundamental right was infringed by the Act.

## B

Having determined that the Act does not burden a fundamental right, we next address plaintiffs' second equal protection argument that the legislation bears no rational relationship to a legitimate governmental interest. *Bernier v. Burris* (1986), 113 Ill. 2d 219, 228-29, 497 N.E.2d 763, 767; *Harris v. Manor Healthcare Corp.* (1986), 111 Ill. 2d 350, 368, 489 N.E.2d 1374, 1382.

■■■ The legislature enacted the Charitable Games Act to provide methods of fund-raising for not-for-profit charitable organizations to enable them to meet their charitable purposes. (Ill. Rev. Stat. 1987, ch. 120, par. 1121.1(a).) The legislative intent was to regulate strictly who may be licensed, as well as when and where charitable game events may be played, and to prescribe recordkeeping of funds raised, all in order to protect not-for-profit organizations and the people of the State of Illinois from the abuses associated with gambling. Ill. Rev. Stat. 1987, ch. 120, par. 1121.1; 86 Ill. Adm. Code 435.100 (Supp. 1987).

■■■ It has long been recognized that the legislature may regulate, restrict or even prohibit gambling activities. (*Finish Line Express, Inc. v. City of Chicago* (1978), 72 Ill. 2d 131, 138, 379 N.E.2d 290, 292.) Allowing not-for-profit charitable, religious or educational organizations to be licensed while excluding for-profit enterprises is rationally related to the State's interest in providing not-for-profit organizations with a method of fund-raising while at the same time protecting the public from abuses associated with gambling. Allowing charitable organizations to obtain a license, while excluding for-profit enterprises, only recognizes that benevolent organizations have a public purpose greater than that of enterprises run for profit.

■■■ As further evidence of rationality, the Act does not rob for-profit enterprises of their chance to strike a blow for charity. They, too, are brought into the fold, yet on their own merits. For-profit entities, like plaintiffs, have an opportunity to participate in raising money for charitable organizations through charitable games by applying for a "providers' license." Any person, firm or corporation may obtain a providers' license whereby they can conduct charitable games. (Ill. Rev. Stat. 1987, ch. 120, par. 1125.) There are several rooms in the house of "Charitable Games": conductor; provider; and supplier. Each has its own purpose and its own license, and the Act places upon each different obligations in accordance with its role.

Differentiating between charitable, religious and educational organizations, on the one hand, and a private restaurant on the other, allowing the former to conduct charitable games, while forbidding the latter, is rationally related to the State interest of providing a means by which not-for-profit organizations may raise funds, but at the same time protecting against the abuses associated with gambling. Accordingly, the Act does not deprive plaintiffs of equal protection of law.

The judgment of the circuit court is affirmed.

Affirmed.

HARRISON and GOLDENHERSH, JJ., concur.